STATE of Missouri, Respondent,

v.

Donald R. NASH, Appellant.

No. SC 90649.

Supreme Court of Missouri,
En Banc.

May 17, 2011.

Frank K. Carlson, Sarah K. Tupper and Michael P. Bastian, The Carlson Law Firm, Union, for Nash.

Theodore A. Bruce, Attorney General's Office, Jefferson, City, for The State.

MARY R. RUSSELL, Judge.

A jury found Donald Nash guilty of capital murder in violation of section 565.001, RSMo 1978, for the 1982 killing of Judy Spencer. He was sentenced to life imprisonment without the possibility for probation or parole for 50 years.

He appeals, asserting that he was wrongly convicted under section 565.001, RSMo 1978, because he argues that this statute was repealed in 1983 and that no other statute replaced it to criminalize the murder with which he was charged. He also maintains that his conviction should be reversed because it rests on insufficient evidence, he was not allowed to offer a circumstantial evidence jury instruction, and the trial court excluded his evidence that another person committed the murder.

Because this Court finds no reversible errors in Nash's case, the judgment is affirmed.[1]

## I. Background

Judy Spencer was killed on the morning of March 11, 1982,[2] in a rural area near Salem, where Judy lived with her boyfriend, Nash. On the night before Judy's death, there had been "a large party" in the area where her body was found.[3] Judy's body had been dragged to and dumped in the foundation of an abandoned outhouse and then covered with tree branches and logs. She had been strangled with a shoelace from her shoe and, then, after she died, had been shot in the neck with a shotgun. Some of her clothing had been strewn in the woods near her body, which was discovered partially clothed. It later was determined, however, that there was no evidence of sexual contact or a sexual assault.

On the day before Judy's death, March 10, she had spent the afternoon and evening drinking[4] and driving around with her friends, including Janet Jones. Judy lied to Nash about drinking that night, saying she was out of town when she actually was drinking at Janet's apartment. Nash went to Janet's apartment to switch cars with Judy, and Janet observed Nash throw Judy's car keys toward her. Judy told Janet that Nash had told her, "This is the last time you'll ever lie to me, bitch." Judy also told Janet, "[Nash] thinks I'm ugly. He doesn't like my hair."

Janet testified that Judy washed and restyled her hair in Janet's sink after talking with Nash that night. Judy went to the home she shared with Nash, and Judy and Nash argued about drinking. Judy then returned to Janet's apartment. Later in the evening, Judy drove off mad and upset, saying she was going to Houston, Missouri.

Nash later told the state trooper who informed him of Judy's death that he had looked for Judy at some time after 8 p.m. March 10. He stated that he had looked for her at the Legion Hall and at the hospital and then had stayed home the rest of the

1. As discussed further below, the State conceded to Nash's assertions that jurisdiction over this appeal is vested in this Court pursuant to Mo. Const. art. V, sec. 3.

2. The defense suggests that the time of death was established as 9:10 a.m., the time that Judy's watch had stopped working. The State, however, argues that there is no evidentiary basis for Nash's insistence that the time of death was 9:10 a.m. March 11. The State's pathologist testified that he could not determine the time of death to a reasonable degree of scientific certainty.

3. Judy's purse was found in a creek bed one-tenth to one-half of a mile away from where her body was found, and her car was discovered about 30 minutes away. Her car had gone down a steep embankment and was stuck in the mud, and it appeared that someone had tried to drive it back onto the road. Beer bottles and cans were found in the interior of the car, and the keys were on the console. The car was thought to have been there since sometime between 9 p.m. March 10 and 7:30 a.m. March 11.

4. Judy's post-mortem blood alcohol content was 0.18 percent.

night and did not leave until the next morning. Judy's friend, Christine Colvin, however, testified at trial that she had seen Nash driving through the parking lot of Janet's apartment complex between 11 p.m. and midnight March 10.

Janet also had searched briefly for Judy on the night of March 10. She recalled that Nash had called her around 8:30 p.m., 9:30 p.m., and 10 p.m. that night, stating that he loved Judy and was worried for her safety. The next day at 5:45 a.m., Janet called Nash, who had requested the previous night that she call him so he would not be late to work. Nash called Janet twice later that morning, again stating that he was worried and looking for Judy. He said that he was concerned that Judy would drink and drive and he feared that she would be in an accident or be arrested.

Nash also called Judy's mother, whom he had never called before, on the morning of March 11. He asked if Judy was at her mother's house, and when she said "no," he said "I won't keep you then." He told Judy's mother that he was calling from the telephone at his work and stated that he was looking for Judy.

In the afternoon on March 11, Nash and Janet left Salem and went to look for Judy in Houston. Nash continued to express that he was concerned for Judy. When Nash and Janet later returned to Salem and went to check Nash and Judy's answering machine, they received a call to come to the hospital, where they were informed that Judy had died. Janet had to be sedated, and Nash became upset and cried. Janet and Nash were interviewed separately by investigators, who did not provide details about Judy's death. Nash described Judy's drinking the night before, and he detailed what she had been wearing when he last saw her.

Janet testified at trial that Nash later appeared heartbroken because of Judy's death. But testimony also revealed that he was involved with another woman within a week of Judy's death.

When Judy's death initially was investigated in 1982, no blood or tissue was found under her fingernails, and no physical evidence linked Nash to the crime scene. He was fingerprinted and was swabbed for gunshot residue, but no gunshot residue was found. He also did not have scratches or marks that would have been consistent with being involved in a physical altercation. There was also no evidence that the tire tracks located in the area where Judy's body was discovered matched Nash's truck.

In May 1982, at the request of law enforcement, Janet recorded a conversation that she had with Nash discussing Judy's death. Janet told Nash that she suspected he was involved in Judy's death. He stated that he did not have an alibi for the night of March 10, and Janet did not ask him about having an alibi for the morning of March 11. He admitted that he had been angry with Judy on the night of March 10, but he also stated, "I'm innocent. They're on the wrong track. They're not going to catch the right guy."

Judy's case laid dormant until 2007, when Judy's sister requested that investigators renew the investigation. Investigators then requested a DNA sample from Nash to compare to DNA evidence found on fingernail clippings taken from Judy's body in 1982. He voluntarily gave a DNA sample, and testing revealed that his DNA was found under the fingernails of Judy's left hand. No DNA profile or evidence of a third person was detected under Judy's fingernails (only Judy's DNA and Nash's DNA was detected).

An information was filed charging Nash with the class A felony of capital murder in violation of section 565.001, RSMo 1978,

and punishable under section 565.008.1, RSMo 1978. A jury trial was held, and jurors heard testimony about the events of March 10 and 11, 1982, and about the DNA evidence. The jury found Nash guilty, and the court sentenced him to life imprisonment with no chance for probation or parole for 50 years. This Court now considers his appeal.

## II. Jurisdiction

Nash's jurisdictional statement asserts that this Court has exclusive jurisdiction over his appeal pursuant to Mo. Const. art. V, sec. 3, because he challenges that his conviction under section 565.001, RSMo 1978, violates Mo. Const. art. III, sec. 28, which provides:

> No act shall be revived or reenacted unless it shall be set forth at length as if it were an original act. No act shall be amended by providing that words be stricken out or inserted, but the words to be stricken out, or the words to be inserted, or the words to be stricken out and those inserted in lieu thereof, together with the act or section amended, shall be set forth in full as amended.

His jurisdictional statement argues that the "statutes under which [he] was charged, tried and convicted are and at all times pertinent hereto were invalid" because the 1983 repeal of section 565.001, RSMo 1978, "was not accompanied or followed by [a] revival or reenactment of the repealed pre-October 1, 1984 [c]apital [m]urder statute, which revival or reenactment is prescribed by Article III, section 28 of the Constitution of Missouri."

But outside of these assertions in his jurisdictional statement, Nash's brief and reply brief do not discuss his challenge to his conviction in light of Mo. Const. art. III, sec. 28.[5] And, because he failed to raise his arguments as to violations of Mo. Const. art. III, sec. 28 in his points on appeal, these arguments are deemed waived. *See Brizendine v. Conrad,* 71 S.W.3d 587, 593 (Mo. banc 2002) (noting that an argument not set out in the point relied on and merely referenced in the argument is non-compliant with Rule 84.04(d) and considered abandoned by this Court). This Court will not review a party's constitutional arguments that are not explained. *See, e.g., Leahy v. Leahy,* 858 S.W.2d 221, 228 (Mo. banc 1993) (citing *Big Boys Steel Erection, Inc. v. Hercules Const. Co.,* 765 S.W.2d 684, 687 (Mo.App. 1989), for the proposition that appellate review is not warranted when " 'references are merely bald statements without supporting argument' " and " 'assertions made without reasoning' ").

Despite Nash's failure to maintain his argument invoking this Court's exclusive jurisdiction, the State's jurisdictional statement concedes that "jurisdiction is vested in the Supreme Court of Missouri" pursuant to Mo. Const. art. V, sec. 3, because Nash "does challenge his conviction as being in violation of [Mo. Const. art. III, sec. 28]." This concession to jurisdiction, however, is insufficient to warrant an opinion by this Court. "This Court may not obtain jurisdiction of the subject matter of [an] appeal by consent, waiver, or in the

---

**5.** The most Nash discussed Mo. Const. art. III, sec. 28 was in his jurisdictional statement supporting his notice of appeal. This previous explanation of this Court's jurisdiction argued that his conviction under section 565.001, RSMo 1978, was invalid because, after that statute was repealed in 1983, the legislature never specifically reenacted or re-

vived it in accordance with Mo Const. art. III, sec. 28 to cover crimes committed prior to October 1, 1984. He argued: "To the extent that Section 565.001 [RSMo 2000] purports to revive the repealed [1978] version, it too is invalid, in that it violates the mandate of [a]rticle III, section 28 of the Constitution of Missouri."

interest of judicial economy." *Kuyper v. Stone Cnty. Comm'n,* 838 S.W.2d 436, 438–39 (Mo. banc 1992) (noting that this Court's jurisdiction may not be expanded beyond its constitutional limits). However, pursuant to Mo. Const. art. V, sec. 10, this Court can take transfer of this case before its disposition by the court of appeals "because of the general interest or importance of a question involved in the case, or for the purpose of reexamining the existing law." Nash's appeal meets this transfer standard insofar as he requests consideration of the constitutional validity of Missouri's long-existing "direct connection rule" for evidence relating to third-person guilt. As such, this Court, on its own motion, transfers this case under Mo. Const. art. V, sec. 10, and examines Nash's assertions of error.

### III. Arguments On Appeal

### A. Nash's Conviction Was Proper Under Section 565.001, RSMo 1978

██ Nash first argues that the trial court erred in overruling his motion to quash the information against him and to dismiss the charges against him. He contends that he improperly was charged, tried, and convicted under section 565.001, RSMo 1978, the statute that criminalized premeditated murder when Judy was killed in March 1982.[6] He maintains that this statute was repealed in 1983 and that no other statute has existed or now exists that allows him to be prosecuted for Judy's murder. He asserts that his conviction under the repealed statute violates section 556.026, RSMo 2000,[7] which provides: "No conduct constitutes an offense unless made so by this code or by other applicable statute." This Court reviews these statutory arguments de novo. *See Sch. Dist. of Kansas City v. State,* 317 S.W.3d 599, 604 (Mo. banc 2010) (noting that statutory construction challenges and constitutional challenges are reviewed de novo).

Section 565.001, RSMo 1978, was repealed in 1983 along with a number of other criminal statutes.[8] In the place of these repealed statutes, the legislature enacted a new chapter 565, which defines offenses against persons. The new provisions included section 565.020, which defines the crime of first-degree murder. The new chapter 565 specified its applicability to crimes committed after July 1, 1984, and its effective date later was changed to October 1, 1984:

1. The provisions of [chapter 565] shall govern the construction and procedures for charging, trial, punishment and appellate review of any offense defined in this chapter and committed after July 1, 1984 [effective date later October 1, 1984].

2. The provisions of this chapter shall not govern the construction or procedures for charging, trial, punishment or appellate review of any offense committed before the effective date of this chapter. Such an offense must be construed, punished, charged, tried and reviewed on appeal according to the applicable provisions of law existing prior to the effective date ... in the same manner as if this chapter had not been enacted, the provisions of section 1.160, RSMo, notwithstanding.

---

6. The State notes that the statute referenced a premeditated murder as "capital murder," regardless of whether the death penalty was sought.

7. Unless a previous version of a statute was amended substantively in a way that impacts this case, or unless otherwise indicated, all statutory references in this opinion are to RSMo 2000.

8. *See* L.1983 S.B. 276.

3. All provisions of "The Criminal Code" or other law consistent with the provisions of this chapter shall apply to this chapter. In the event of a conflict, the provisions of this chapter shall govern the interpretation of the provisions of this chapter.

. . .

Section 565.001.

Nash maintains that the reference in section 565.001.2 to "the provisions of section 1.160, RSMo, notwithstanding," makes the provisions of section 1.160, RSMo Supp.2010, inapplicable to all murders committed before October 1, 1984. Section 1.160, RSMo Supp.2010, referred to as the "saving statute," provides:

> No offense committed and no fine, penalty or forfeiture incurred, or prosecution commenced or pending previous to or at the time when any statutory provision is repealed or amended, shall be affected by the repeal or amendment, but the trial and punishment of all such offenses, and the recovery of the fines, penalties or forfeitures shall be had, in all respects, as if the provisions had not been repealed or amended, except that all such proceedings shall be conducted according to existing procedural laws.

He argues that, because the "notwithstanding" phrase in section 565.001.2 expresses that section 1.160, RSMo Supp. 2010, does not apply to the new chapter 565 provisions, no statute is in place that allows him to be prosecuted for Judy's murder, which occurred prior to the October 1, 1984, effective date for the new chapter 565, but was not prosecuted before the new provisions took effect.

This Court, however, is not persuaded by Nash's insistence that Judy's murder cannot be charged and punished pursuant to the provisions of section 565.001, RSMo 1978. The "notwithstanding" phrase of the new section 565.001.2 cannot be read in a way that would decriminalize a subset of murders simply because the perpetrators avoided prosecution before October 1, 1984.

▪ Statutes cannot be interpreted in ways that yield unreasonable or absurd results, and it is assumed that the legislature's enactment of a statute is meant to serve the best interests and welfare of the general public. *See Tribune Pub. Co. v. Curators of Univ. of Mo.*, 661 S.W.2d 575, 583 (Mo.App.1983). These canons of statutory construction undermine Nash's arguments that section 1.160, RSMo Supp.2010, is inapplicable and fails to permit his prosecution under section 565.001, RSMo 1978. Nash's view of the meaning of the "notwithstanding" phrase in section 565.001 advances that certain murders escape prosecution based on legislative semantics. This is an absurd result that is against the public's interest.

The apparent purpose of the 1983 enactment of the new section 565.001 was to make clear that an offense committed in 1982 should be charged and prosecuted according to the laws existing in 1982, not the law as it existed after the new chapter 565 changes were enacted. The effect of the language of section 565.001.2 is the same as the language in section 1.160, RSMo Supp.2010. The trial court did not err in allowing Nash's prosecution under section 565.001, RSMo 1978, to proceed, as Nash was not entitled to have the information filed against him dismissed.

### B. Sufficiency of the Evidence

Nash also argues that the evidence against him was insufficient to sustain his conviction, particularly because the State's case relied on circumstantial evidence.

### 1. The Applicable Standard of Review

▪ Generally, this Court's review of the sufficiency of the evidence is limited to

whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of the defendant's guilt beyond a reasonable doubt. *State v. Bateman*, 318 S.W.3d 681, 686–87 (Mo. banc 2010). This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational factfinder "could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 687 (internal quotations omitted). In reviewing the sufficiency of the evidence, all evidence favorable to the State is accepted as true, including all favorable inferences drawn from the evidence. *Id.* All evidence and inferences to the contrary are disregarded. *Id.* "When reviewing the sufficiency of evidence supporting a criminal conviction, the Court does not act as a 'super juror' with veto powers, but gives great deference to the trier of fact." *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998) (internal quotations omitted). "[T]his Court will not weigh the evidence anew since the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *State v. Freeman*, 269 S.W.3d 422, 425 (Mo. banc 2008) (internal quotations omitted).

Nash, however, argues that these current standards of review do not accurately reflect the standard of appellate review this Court should employ in assessing the sufficiency of the evidence in his case. He argues that the standards expressed above differ from the standard of review for testing the sufficiency of the evidence for a 1982 case based on circumstantial evidence. He argues that in 1982 his case would have been held to a higher sufficiency of the evidence standard based on the circumstantial evidence rule, which at the

time required: "Where the conviction rests on circumstantial evidence, the facts and circumstances to establish guilt must be consistent with each other, consistent with the guilt of the defendant, and inconsistent with any reasonable theory of his innocence." *See State v. Grim*, 854 S.W.2d 403, 405–07 (Mo. banc 1993) (discussing the historical purpose and application of the circumstantial evidence rule). In 1993, *Grim* abrogated the circumstantial evidence rule and rejected the use of the circumstantial evidence instruction. *Id.* at 407–08. Nash argues that failure to employ the circumstantial evidence rule in his case, as this Court would have done *pre-Grim*, will result in "an ex post facto-type violation of [his] due process rights" because his conviction will then be "resting upon insufficient evidence" according to standard appropriate in 1982.

Nash argues that this Court's failure to apply the circumstantial evidence rule would result in the type of ex post facto violation described in *Calder v. Bull* as a "law the alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender." 3 U.S. 386, 390, 3 Dall. 386, 1 L.Ed. 648 (1798). But this Court's appellate review of the evidence through the lens of the present sufficiency of the evidence standards versus the circumstantial evidence rule does not alter what was required "in order to convict" Nash for Judy's murder.

Ex post facto concerns exist where "the government refuses, after the fact, to play by its own rules, altering them in a way that is advantageous only to the State, to facilitate an easier conviction." *Carmell v. Texas*, 529 U.S. 513, 533, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000). In Nash's case, the elements of the crime that

the State was required to prove beyond a reasonable doubt did not change from 1982 to the present. As such, Nash's concerns about the standard of appellate review used by this Court to assess the sufficiency of the evidence do not present ex post facto or due process concerns as there was no alteration in what the State was required to prove in order to convict Nash.[9] Use of the present sufficiency of the evidence standards to review Nash's case will not violate his constitutional rights. *Cf. Freeman*, 269 S.W.3d at 425 (employing post-*Grim* sufficiency of the evidence review standards to a crime that occurred pre-*Grim* but was not prosecuted until after *Grim* ).

## 2. The Evidence Was Sufficient

█ Viewing the evidence in the light most favorable to Nash's conviction, there was sufficient evidence to allow a rational trier of fact to find him guilty beyond a reasonable doubt for Judy's murder.

The State's evidence included that only Judy's DNA and Nash's DNA were found under Judy's fingernails at the time of her death. It was the jury's province to weigh the theories offered by the State and the defense as to the significance of Nash's DNA being found.

The State's DNA expert stated that the quantity of DNA found and tested from under Judy's fingernails was not considered a "low level" sample of DNA, distinguishing the tested sample from one that would be considered "low level, non-con-

tact." The expert testified that the same quantities of Nash's DNA and Judy's own DNA were found in the tested DNA sample.

The prosecution suggested that Nash's DNA lodged under Judy's fingernails when he killed her. It argued that Nash's DNA would not have been present on Judy on March 11 unless he had recent contact with her, highlighting that Judy had washed her hair on the night before her death. Although it was not known if Judy had washed her hair using shampoo, the State's DNA expert testified that hair-washing, particularly with shampoo, would remove DNA from underneath the fingernails that existed prior to the washing. The expert did not have an opinion as to what quantity of DNA would persist under fingernails following shampooing, but said it would "have a great effect" in removing DNA.

In countering the State's DNA evidence, Nash argued that the DNA evidence was insignificant and did not establish that he killed Judy. He maintained that the amount of his DNA found under Judy's fingernails was what would be expected to be present from touching a surface or clothing. He highlighted that there was no evidence of a struggle involved in Judy's murder, and he argued that his DNA was present because he and Judy lived together, not because he struggled with or killed her. He also presented evidence of studies examining DNA evidence found under fingernails.[10] His evi-

---

**9.** *Cf. Carmell*, 529 U.S. at 532–33, 120 S.Ct. 1620 (finding an ex post facto violation where the statute was amended in a way that altered the rules of evidence and required less evidence to obtain conviction; noting ex post facto concerns are raised where "the government subverts the presumption of innocence by reducing the number of elements it must prove" and "[r]educing the quantum of evidence necessary to meet the burden of proof

is simply another way of achieving the same end").

**10.** Testimony included discussions about a journal study involving DNA evidence relating to cohabiters, an article about DNA evidence concerning a male nurse who sexually abused a patient and frequently washed his hands, and an article reviewing the persistence of

dence included that cohabiters in some homes commonly carry one another's DNA. He also suggested that his DNA could have been present because he and Judy had sexual relations a few days before her death.

The jury, by its verdict, found that the State's expert's testimony suggesting that Nash's DNA from under Judy's fingernails that existed on the night before her murder would have been removed when she washed her hair. It is not this Court's role to reweigh the DNA evidence to contradict the jury's conclusions. *See State v. Hampton*, 959 S.W.2d 444, 450 (Mo. banc 1997) (refusing to "reweigh the evidence and second-guess" the trier of fact's factual conclusion that was supported by expert testimony). There was sufficient evidence to support the jury's conclusions that Nash's DNA, rather than a third person's DNA, was present under Judy's fingernails because Nash was the last person to have contact with Judy before she was killed.

Additionally, viewing the evidence in the light most favorable to the State, other evidence supported the jury's conclusions that the presence of Nash's DNA was significant in linking him to Judy's death: the investigator who requested that Nash submit to DNA testing testified that Nash appeared to be very nervous at the time and his hands were shaking; he asked the investigator "will you let me know if I am eliminated?"; he told the investigator that he believed a female may have killed Judy, and he "stepped back and stared" at the investigator when he was told the DNA profile was that of a male; and when he was told that his DNA was found on

Judy's fingernails and at the crime scene, he said it was not possible and his hands began shaking.[11]

And this DNA-related evidence was bolstered by the other evidence favorable to the jury's conclusion that Nash killed Judy: he had told her the night before she died, "That's the last time you'll lie to me, bitch."; he was seen driving around Janet's apartment complex at a time after he told police he had gone home for the night on March 10; he was living with Judy but asked Janet to call him and wake him the morning Judy was killed; and he was involved with another woman shortly after Judy's murder.

In Nash's case, a reasonable juror could have found him guilty beyond a reasonable doubt for Judy's murder, especially considering the DNA evidence together with the other evidence favorable to the jury's guilty verdict. There was sufficient evidence to support Nash's conviction.

## C. A Circumstantial Evidence Instruction Was Not Required

Nash also argues that his conviction should be overturned because the trial court erred in refusing to give the jury his proffered circumstantial evidence instruction that would have been applicable in 1982.

In reviewing Nash's claims of instructional error, this Court will reverse the trial court's decision only if the instructional error misled the jury and, thereby, prejudiced Nash. *State v. Avery*, 275 S.W.3d 231, 233 (Mo. banc 2009). "[R]eversal is only warranted when the instructional error is so prejudicial that it de-

---

DNA under fingernails following submersion in water.

**11.** The defense highlighted on cross-examination that Nash's statement that it was not possible was linked to the suggestion that his

DNA was found at the crime scene. It notes that Nash's DNA was found only under Judy's fingernails and not, as the investigator had told Nash, at the crime scene.

prived the defendant of a fair trial." *State v. Anderson*, 306 S.W.3d 529, 534 (Mo. banc 2010).

Nash argues that failure to instruct the jury with the 1982 circumstantial evidence instruction resulted in an "ex post facto alter[ation of] the legal rules of evidence to permit [him] to be convicted on less, or different, evidence than the law required" in 1982. But the court's refusal to issue the circumstantial evidence instruction did not change the elements of the crime that the State was required to prove beyond a reasonable doubt to convict Nash. As discussed above, Nash cannot show he suffered an ex post facto-type violation where nothing altered what the State was required to prove for his conviction. And the trial court's refusal to give the circumstantial evidence instruction did not impact the fairness of Nash's trial, particularly because the jury instead was instructed with the reasonable doubt instruction, which Nash does not challenge.

*Grim* equated the circumstantial evidence instruction to the reasonable doubt instruction, calling it a "different rule stating the same standard." *See* 854 S.W.2d at 408. In rejecting the use of the circumstantial evidence instruction, *Grim* stated:

> We have honed our reasonable doubt instruction with legal analysis brought on by decades of defendants' attacks coming from every point of the compass. We believe the reasonable doubt instruction fully and accurately instructs the jury on the risk of non-persuasion. **The circumstantial evidence instruction no longer serves the same purpose it did**....
>
> **A different rule stating the same standard is confusing and redundant.** The previous justifications for requiring more evidence have been abandoned. Under any interpretation of the quantum of evidence required by the circum-

stantial evidence rule, the rule is no longer valid. It should be, and is, rejected.

*Id.* (emphasis added).

Because the circumstantial evidence instruction and the reasonable doubt instruction instruct the jury on "different rule[s] stating the same standard," offering both instructions would have been "confusing and redundant." As such, Nash cannot show that it was reversible error for the trial court to refuse to offer the circumstantial evidence instruction along with the reasonable doubt instruction.

Nash also argues that the trial court erred in refusing to give the 1982 circumstantial evidence instruction because failure to use the instruction was contrary to the requirements of section 565.001.2, which provides that the law to be applied for a 1982 case is the law in effect in 1982. The language of this statute, however, does not mention jury instructions. There is no statutory requirement that the court offer 1982 jury instructions in Nash's case.

■ The court's goal in instructing the jury is to provide it accurate instructions as to the burden of proof. *See Drury v. Mo. Pac. R. Co.*, 905 S.W.2d 138, 146 (Mo. App.1995) ("The primary goal in instructing a jury is to translate complicated legal concepts into simple, clear and accurate laymen's language so that the jury may understand the factual issues of a claim or defense and act properly in deciding the case."). In Nash's case, because the instructions used accurately instructed the jury as to the State's burden, Nash cannot show that reversal is warranted based on the court's refusal to provide the jury the 1982 circumstantial evidence instruction.

### D. Evidence Of Third–Person Guilt

■ Nash also asserts that the trial court erred in sustaining the State's mo-

tion in limine that prevented him from introducing evidence that another person murdered Judy. The State maintains that the evidence properly was excluded because it failed to meet the "direct connection rule" for evidence relating to a third person's guilt. This Court has explained the "direct connection rule" as follows:

> To be admissible, evidence that another person had an opportunity or motive for committing the crime for which a defendant is being tried must tend to prove that the other person committed some act directly connecting him with the crime. The evidence must be of the kind that directly connects the other person with the *corpus delicti* and tends clearly to point to someone other than the accused as the guilty person. Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.

*State v. Rousan*, 961 S.W.2d 831, 848 (Mo. banc 1998) (internal citations and quotations omitted).

### 1. Missouri's "Direct Connection Rule" Is Constitutional

 Nash argues that his constitutional rights to present his defense were violated by the exclusion of his evidence that a third person killed Judy. He maintains that the "direct connection rule" for evidence of third-person guilt unconstitutionally requires the defendant to show evidence of the third person's guilt that meets a higher standard than the beyond-a-rea-

sonable-doubt standard required for convictions.

 Although there is "broad latitude under the Constitution to establish rules excluding evidence from criminal trials[,]" that latitude is limited by the defendant's constitutional rights to "a meaningful opportunity to present a complete defense," which are rights rooted in the 14th Amendment due process clause and the 6th Amendment compulsory process and confrontation provisions. *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (internal quotations omitted). The defendant's right to present evidence in his defense cannot be impeded by rules that "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (internal quotations omitted).

Nash notes that in *Holmes*, the United States Supreme Court invalidated a South Carolina evidentiary rule that had been invoked to exclude third-person guilt evidence offered by the defendant. *Id.* at 330–31, 126 S.Ct. 1727. The invalidated rule at issue in *Holmes*, however, differed from Missouri's "direct connection rule" that Nash challenges. *Holmes* struck down an evidentiary rule that "held that where there is strong evidence of an appellant's guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the appellant's own innocence." *Id.* at 324, 126 S.Ct. 1727 (internal quotations omitted). *Holmes* noted previous cases where evidentiary rules limiting the defense had been found unconstitutional,[12] but it also

---

12. *Holmes* noted several cases involving unconstitutional "'arbitrary' rules, *i.e.*, rules that excluded important defense evidence but that did not serve any legitimate interests."

547 U.S. at 325–326, 126 S.Ct. 1727 (noting *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (invalidating a statute that barred testimony by a co-partici-

highlighted that an evidentiary rule was found not to be unconstitutional where it "did not abridge the right to present a defense because [it] served several legitimate interests in the criminal trial process [and] was neither arbitrary nor disproportionate in promoting these ends and did not implicate a sufficiently weighty interest of the defendant." *Id.* at 326, 126 S.Ct. 1727 (citing *U.S. v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)) (internal quotations omitted).

*Holmes* provides:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.... Plainly referring to rules of this type, we have stated that the Constitution permits judges to exclude evidence that is repetitive [or] only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues....

> A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged.[13] ... Such rules are widely accepted[.]

*Id.* at 326–27, 126 S.Ct. 1727 (internal references omitted).

In light of *Holmes,* Missouri's "direct connection rule" is constitutional because it prevents confusion of the issues and reduces the potential to mislead the jury. It is not arbitrary to exclude evidence that does not directly connect a third person to the charged crime.

## 2. The Third–Person Guilt Evidence Was Excluded Properly

 Nash argues that the trial court wrongly refused to admit his evidence that a third party, Anthony Lambert Feldman, had motive and opportunity to kill Judy. Nash's offer of proof highlighted that the evidence about Feldman included that Feldman's fingerprints were found on Judy's car, but Nash's and Judy's finger-

---

pant in a crime unless that person had been acquitted); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (finding unconstitutional "the voucher rule," which denied the defendant the right to impeach his own witnesses); *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (overturning a decision that prevented the defendant from attempting to show at trial that his confession was unreliable); *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (holding unconstitutional a rule prohibiting hypnotically refreshed testimony)).

**13.** *Holmes's,* support for this proposition includes:

> *See, e.g.,* 41 C.J.S., Homicide § 216, pp. 56–58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded"); 40A Am.Jur.2d, Homicide § 286, pp. 136–138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged.... [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial[.]").

547 U.S. at 327, 126 S.Ct. 1727.

prints were not. Nash asserted that his evidence would include that there had been a heavy rainstorm on the night of March 10, which suggested that the rain had washed other fingerprints off Judy's car. Nash also wished to present evidence that included: Feldman falsely had denied to police that he had met Judy or ever been to Salem; Feldman had an Iowa arrest for stalking a woman with the intent to assault her sexually; Feldman was known to carry a shotgun in his vehicle; and Feldman had killed himself in 2008 with a shotgun.

▬▬▬▬ The trial court's decision to exclude Nash's evidence as to Feldman is a ruling that this Court reviews to determine if the trial court abused its discretion. *See State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). The trial court has broad discretion in evidentiary rulings, and an abuse of discretion will not be found unless the ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. *Id.* Evidentiary errors require reversal if they are prejudicial to the defendant because they deprived him of a fair trial. *Id.* at 223–24. An error is not prejudicial if there is no reasonable probability that it affected the outcome of the trial. *Id.* at 224.

As discussed above, the "direct connection rule" required that the Feldman evidence directly connect him to the *corpus delicti* of Judy's murder. *See Rousan*, 961 S.W.2d at 848. The rule also rejects evidence relating to a "disconnected or remote act" outside of Judy's murder. *See*

*id.* Considering Nash's evidence as to Feldman in light of Missouri's "direct connection rule," the trial court's conclusion that Nash's evidence did not meet the requirements of the rule was not a decision that was clearly against the logic of the circumstances and so unreasonable as to indicate a lack of careful consideration. As such, the trial court did not abuse its discretion in refusing to admit the Feldman evidence.[14]

### IV. Conclusion

For the foregoing reasons, the judgment is affirmed.

All concur.

---

14. In addition to complaining that the Feldman evidence was excluded at trial, Nash also argues that the State wrongly was allowed to reference in its closing arguments that there was no evidence of third-party guilt. The State's reference to third-party involvement, however, related to the DNA evidence. To counter Nash's assertions that his DNA was under Judy's fingernails due to casual contact, the State argued: "If DNA gets under your fingernails so easily, then where's the third sample?" This argument did not prejudice Nash based on his inability to admit the Feldman evidence. Nash did not object when the State made this argument in its closing.