STATE of Missouri, Respondent,

v.

Deonta R. TAYLOR, Appellant.

No. WD 72831.

Missouri Court of Appeals,
Western District.

Oct. 30, 2012.

Irene Karns, Columbia, MO, for Appellant.

Jessica Meredith, Jefferson City, MO, for Respondent.

Before JAMES EDWARD WELSH, C.J., THOMAS H. NEWTON, and GARY D. WITT, JJ.

JAMES EDWARD WELSH, Chief Judge.

Deonta R. Taylor appeals the circuit court's judgment convicting him of two counts of murder in the first degree and two counts of armed criminal action. He asserts that the evidence was insufficient to convict him of the offenses because the eyewitness identifications were inherently unreliable, the DNA evidence was not substantial, and no one testified that Taylor was inside the club before committing the murders outside the club after hours. Taylor also contends that the circuit court abused its discretion in denying his motion for a mistrial after a detective testified that someone at the club checked a person's identification against the person who presented it on the night of the murders. We affirm the circuit court's judgment.

Viewing the evidence in the light most favorable to the verdict, the evidence established that, in February 2009, Mahogany Robinson, Myeshia Harper, Stephanie Bell, Neena Puckett, and Adonis Taylor worked at Gerry's Silver Slipper (the club) on Independence Avenue in Kansas City, Missouri. On February 6, 2009, sometime after 3:00 a.m., which was after the club closed, the women left the club and walked into the parking lot. As they left the building, they saw a man, who was later identified as Drell Fisher, walking in the parking lot. Fisher had driven to the parking lot in a red car, which he had parked near the club. Reginald Barnes was sleeping in Fisher's car. Upon seeing the women, Fisher stood outside his car and talked with Puckett.

Soon thereafter, Robinson went to her car to drive Harper, Bell, and Adonis Taylor home for the night. As the women pulled out of the parking lot, they saw a man wearing a gray hooded zip-up or pullover shirt ("gray hoodie") walking past their car and towards the club where Puckett and Fisher were talking. Robinson decided to drive around the building and back to the parking lot to tell Puckett to leave because she was the only woman

standing in the parking lot. As Robinson approached the parking lot where Puckett stood, she saw the man in the gray hoodie walk up to where Puckett and Fisher were talking. Robinson said that she heard a loud bang and then saw the man in the gray hoodie lean into the red car.

Harper, who was in the car with Robinson, said that she heard the man in the gray hoodie say something, and then she saw "a muzzle flash from a gun" and Fisher falling to the ground. According to Harper, the man in a gray hoodie then reached for the door of the red car, and Harper saw another "muzzle flash."

Upon hearing the loud bang, Robinson turned her car around and headed towards Independence Avenue. Harper called the police as they drove away. Robinson took the women in her car home, but the manager of the club telephoned them and told them that the police wanted them to return to the club. Thereafter, Robinson and Harper returned to the club's parking lot.

In the meantime, police officers were dispatched to the address of the club. On their way to the club, Officers James Cisneros and Von Burns saw a vehicle stopped in the middle of the street, which was in relative close proximity to the club. When the officers shined their car's spotlight on the stopped vehicle, Elvie Black exited the car and started running south of the club. As Black ran from the police, Black held a gun in his hand, which he pointed at one of the officers. While he was running, Black slipped and fell, and the gun fell out of his hand. According to the police, Black was a large man, about six feet three inches tall and weighed around 250 pounds. When the police apprehended Black, he was wearing a hooded gray sweatshirt.

Officer Johnie Wyatt was dispatched to assist Officers James Cisneros and Von Burns. When he arrived at the scene, he was flagged down by the manager of the club, who told Wyatt that there were two injured people in the parking lot. In the club's parking lot, Wyatt found a man, who was bleeding from the mouth, nose, and chest, in the passenger side of a red car and found another man, bleeding from the chest, lying on the ground outside the driver's side of the car.

Later that morning, Robinson and Harper gave statements to the police.[1] Robinson described the man in the gray hoodie as a light-skinned man with a slender build whose hair was in cornrowed braids and was five feet eleven inches to six feet one inch tall. Harper described the man in the gray hoodie as having a medium complexion, five feet two or three inches tall, with a goatee about three inches long. Harper said that she could not see the man's hair because the hoodie was pulled up over it.

1. Puckett, Bell, Adonis Taylor, and Puckett's mother (who was in Puckett's car at the time of the shootings) were also interviewed by the police. Of these four women, Bell was the only one who testified at trial. After the shootings, Bell gave a statement to the police acknowledging that she saw a black man in a gray hoodie with a gun in his hand walk up and shoot the victim in the head and "blow his brains out." She also told the police that the guy in the gray hoodie then began shooting inside the car and "shot the other guy" who was in the front passenger seat of the car. Bell also identified Taylor as the shooter from the police photo lineup. At trial, however, Bell said that she was intoxicated on the night of the shooting, that she did not see anyone in the parking lot, that she did not see the shooting take place because she was too scared to look, and that she did not see a gun or see the face of the shooter. As to the photo lineup, Bell said that she just picked Taylor from the lineup because she had seen him around the club and that she did not see him shoot anybody.

David Needham was the lead detective in the case. At the scene, the police found nine millimeter shell casings, which did not match the .38 caliber revolver that the police recovered when they arrested Black. Thus, because the weapons differed and because Black did not match any of the descriptions given by witnesses, Needham began to look elsewhere for a suspect.

As part of his investigation, Needham acquired a compact disc that the club had made which contained the scanned driving licenses of people who entered the club the evening before the murders. According to Needham, the club had "a deal where not only [did the club] check your driver's license, but they ha[d] a computer system where they scan[ned the driving license] and . . . save[d] it in the computer." Needham looked at the driving licenses on the compact disc and discovered that Black entered the club at "2 a.m. at 11 minutes and 11 seconds" and that Taylor followed him in at "2 a.m., 11 minutes and 22 seconds."[2] Because of the close proximity in time of Taylor's entry into to the club after Black, Needham requested that the Department of Revenue send him a bigger picture of Taylor for "comparison purposes." Because there were similarities in the descriptions provided by the witnesses and the attributes on Taylor's driving license, Needham decided to create two photo lineups using both Black's and Taylor's photographs.[3]

Needham then went to the home of Robinson to show her the photo lineups. Robinson picked Taylor's photograph from the first lineup as the man she saw in the gray hoodie on the night of the murders, but she could not identify anyone from the second lineup, which contained Black's photograph. Later that day, Needham showed the same photo lineups to Harper. Harper also identified Taylor as the man she saw in the gray hoodie on the night of the murders. In the second lineup, Harper identified Black as a customer of the club.[4]

The state charged Taylor with two counts of armed criminal action and two counts of murder in the first degree based on the February 6, 2009, shooting deaths of Fisher and Barnes. Taylor was arrested in Forest City, Arkansas, on May 1, 2009. When questioned by Needham, Taylor told Needham that he had never been to Kansas City since he was born. When Needham showed Taylor the scanned driving license from the club's computer, Taylor told Needham that he had lost his driving license.

Jackson County deputy medical examiner, Dr. Ariel Goldschmidt, performed autopsies on Fisher and Barnes. After Dr. Goldschmidt left the employment of the Jackson County Medical Examiner's office, Dr. Daniel Lingamfelter reviewed the reports, diagrams, and photographs comprising the autopsies of Fisher and Barnes. Based on his independent analysis of the source material, Dr. Lingamfelter concluded that the deaths of both men were homicides. He determined the cause of death of Fisher was a gunshot wound to the head and that Barnes died of multiple gunshot wounds.

2. The club manager testified that on the night of the shooting that the scanner was off an hour because of daylight savings time.

3. Needham identified Taylor at trial as the same person that was depicted in the photograph used in the first photo lineup.

4. Needham also attempted to show the photo lineups to Puckett. According to Needham, Puckett left town, and he was unable to establish contact with her. Needham said that he was never able to find Puckett. Puckett, therefore, was not called as a witness at trial.

Gregory Hummel, employed in the DNA section of the Kansas City Police Crime Laboratory, testified about the results of tests comparing DNA swabs taken from the door handle of the red car and buccal swabs of Taylor. A DNA sample taken from the top edge of the driver's door was not sufficient to permit analysis. The second sample, from the door handle, was adequate for testing. Hummel developed two partial genetic profiles from the sample. He explained that there was more DNA belonging to one person, the major contributor, than of the second, the minor contributor. The minor partial genetic profile matched with Taylor's DNA profile. Hummel explained that the term "match" in this context meant that specific sites of a DNA profile were the same as corresponding sites in the partial profile that it was being compared to. He testified that the frequency of the partial genetic profile of the minor contributor in this sample was one in 3,200 individuals. He said the term "match" did not denote an identification of Taylor.

The jury found Taylor guilty of two counts of first-degree murder and two counts of armed criminal action. The circuit court denied Taylor's Motion for Judgment of Acquittal Notwithstanding the Verdict of the Jury, or in the Alternative for a New Trial, and sentenced him to concurrent terms of twenty-five years on each of the two counts of armed criminal action and life without possibility of probation or parole on the two counts of first-degree murder. Taylor appeals.

■ In his first point on appeal, Taylor asserts that the circuit court erred in overruling his motion for judgment of acquittal and in imposing judgment against him because the evidence was insufficient for a reasonable juror to find him guilty beyond a reasonable doubt. In particular, Taylor contends that the evidence was insufficient because the eyewitness identifications were inherently unreliable, the DNA evidence was not substantial, and no one testified that Taylor was inside the club before committing the murders outside the club after hours. We find the evidence sufficient.

Our review of a sufficiency of the evidence claim "is limited to whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of the defendant's guilt beyond a reasonable doubt." *State v. Nash,* 339 S.W.3d 500, 508–09 (Mo. banc), *cert. denied,* —— U.S. ——, 132 S.Ct. 421, 181 L.Ed.2d 274 (2011). The question is not whether "the Court believes that the evidence at trial established guilt beyond a reasonable doubt," but "whether, in light of the evidence most favorable to the State, any rational fact-finder 'could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 509 (citation omitted). "In reviewing the sufficiency of the evidence, all evidence favorable to the State is accepted as true, including all favorable inferences drawn from the evidence." *Id.* We do not reweigh the evidence, and we disregard all evidence and inferences contrary to the verdict. *Id.*

■ In attacking the inherent deficiencies of eyewitness testimony, the defense has four basic avenues: (1) challenge the credibility and unreliability of a witness's identification through rigorous cross-examination, (2) offer expert testimony as to the general unreliability of the eyewitness testimony (admission of such testimony lies within the sound discretion of the circuit court),[5] (3) challenge the admissibility of

---

5. The court may but is not required to admit such testimony, and, in doing so, it uses the

same standard for determining the legal relevance of any evidence by weighing the proba-

eyewitness identification caused by impermissible police suggestiveness, and (4) challenge the admissibility of eyewitness identification as being more prejudicial than probative. *State v. Body*, 366 S.W.3d 625, 629 (Mo.App.2012). In this case, Taylor attacked the inherent deficiencies of the eyewitnesses' testimonies using the first two avenues.

Taylor offered the testimony of Dr. John Gambon,[6] a psychology professor, who testified about factors that bear on memory formation, retention, and recall or retrieval. He named several factors that affect the reliability of eyewitness identifications including the time of day, how long the event lasts, the effect of stress on the witness's ability to perceive and remember, and impairment of a person's ability to perceive and form a memory due to intoxication. Gambon explained that the cumulative effect of those factors increased the likelihood that the witness would make a mistaken eyewitness identification. In reliance on Gambon's testimony, Taylor asserts that Robinson's and Harper's identifications of Taylor as the shooter were rendered inherently unreliable because (1) they had little opportunity to see the man in the gray hoodie when the event occurred, (2) the highly stressful experience impaired their ability to commit what they had seen to memory, and (3) their ability to observe and remember the appearance of the shooter was impaired by drugs and alcohol. Taylor's sufficiency argument regarding the eyewitnesses' identifications, however, ignores our standard of review

and essentially questions the witnesses' credibility.

As previously noted, this Court need only determine whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt. *Nash*, 339 S.W.3d at 509. A jury is free to believe " 'all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case.' " *Id.* (citation omitted). "It is the job of the jury to determine the credibility of witnesses, resolve conflicts in testimony, and weigh evidence." *State v. Letica*, 356 S.W.3d 157, 167 (Mo. banc 2011). " 'A defendant is not entitled to a judgment of acquittal merely because of discrepancies or conflicts in the testimony of the state's witnesses.' " *State v. Newberry*, 605 S.W.2d 117, 121 (Mo. banc 1980).

Thus, whether the eyewitnesses had the opportunity and ability to perceive and recall the shooter was rightfully a matter for the jury to weigh. That Robinson and Harper briefly saw and initially provided varying descriptions of the man in the gray hoodie and that the women were in a highly stressful situation and started screaming after the first shot was fired were matters that the defense brought out during their cross-examinations. Moreover, during both direct and cross-examinations, both Robinson and Harper were thoroughly questioned about their alcohol and drug use on the night of the murders.[7]

---

tive value of the evidence against the dangers of unfair "prejudice, confusion of the issues, misleading the jury, undue delay, waste of time or cumulativeness." *State v. Barriner*, 111 S.W.3d 396, 401 (Mo. banc 2003).

6. On cross-examination, Gambon stated that he did not have any specific training in eyewitness identification but based his testimony on his personal interest and research on the

topic. Further, at the time of trial, he had not published any papers or given any speeches on the topic.

7. Robinson testified that she had four shots of vodka during her six-hour shift. Harper testified that she had seven or eight shots, smoked marijuana, and took Ecstasy during her shift that night.

Thus, the jury was fully aware of the potential weaknesses in the eyewitnesses' testimony. In spite of these weaknesses, the jury obviously found Robinson's and Harper's identification of Taylor as the shooter to be credible. It is not for this court to weigh the evidence or determine the reliability or credibility of the witnesses. "We defer to the jurors' superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony." *State v. Lopez–McCurdy,* 266 S.W.3d 874, 876 (Mo.App.2008).

Taylor further claims that the evidence was insufficient because "the DNA evidence was not substantial." By focusing on how the DNA evidence was not *conclusive* in and of itself, Taylor again ignores the standard of review, which requires this Court to disregard evidence and inferences contrary to the verdict. Taken *alone,* the DNA evidence may not have been sufficient to sustain Taylor's conviction, but that was not the only evidence presented in this case.

Moreover, Taylor's argument suggests that, because there was not a significant sample of DNA available, the State should not have put forth the evidence at all. On the contrary, even though a full genetic profile was not obtained, the fact-finder could rely on the partial profiles that left Taylor as a possible source of the DNA along with the other evidence in determining guilt. *State v. Harding,* 323 S.W.3d 810, 817–18 (Mo.App.2010). "The weight to be afforded this evidence was within the province of the jury to decide." *State v. Rockett,* 87 S.W.3d 398, 405 (Mo.App.2002) (holding that the jury could rely on DNA evidence that did not result in a positive identification of the defendant). Indeed, in *State v. Abdelmalik,* 273 S.W.3d 61, 64 (Mo.App.2008), this court said that, even though a full genetic profile could not be produced from the materials gathered, it was permissible for the jury to give significant weight to the DNA evidence when the partial profiles generated from those samples did not eliminate the defendant as a possible source of the material. In this case, the jury weighed the evidence that Taylor's DNA could not be excluded as that of the minor contributor to the DNA found at the crime scene with the other evidence presented and determined that Taylor was guilty of the crimes charged. Again, "[w]e defer to the jurors' superior position to weigh and value the evidence[.]" *Lopez–McCurdy,* 266 S.W.3d at 876.

Taylor's final sufficiency argument alleges that "there was no testimony that Mr. Taylor was in the club the night of the murders." The State was not required to prove that Taylor was in the club before committing murder outside the club after hours. The State's evidence merely established that Taylor was likely in the club that evening. The State presented evidence that every person who enters the club is required to show identification, which the club scans into its security system. The club manager testified that, although the law requires the club only to allow patrons age 21 or older, the club preferred to limit admission to persons age 25 and older. Although there was no specific testimony from the club employee who checked identifications at the door, it would be reasonable for the jury to infer that the club checked each person's identification and compared it to the facial and physical characteristics of the person presenting it, before allowing that person into the club. The State presented uncontested evidence that Taylor's identification was scanned at the club on the night of the murder. Although Taylor presented evidence that he told a police detective that his identification had been lost, it was up to the jury to weigh the evidence. Based

upon the evidence presented about the identification scanning system used by the club, the jury could have reasonably concluded that Taylor was at the club on the night of the murders.

We, therefore, conclude that the circuit court did not err in overruling Taylor's motion for judgment of acquittal and in imposing judgment against him because the evidence was sufficient for a jury to find Taylor guilty, beyond a reasonable doubt, of two counts of first-degree murder and two counts of armed criminal action. Point one is denied.

In his second point, Taylor contends that the circuit court abused its discretion in denying his motion for a mistrial after a detective testified that, on the night of the murders, someone at the club checked the identifications presented against the people who entered the club. Taylor claims that the detective's testimony was hearsay. We disagree.

Our review of a circuit court's refusal to grant a mistrial is for an abuse of discretion. *State v. Ward,* 242 S.W.3d 698, 704 (Mo. banc 2008). "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary and unreasonable as to shock the appellate court's sense of justice and indicate a lack of careful consideration." *Id.* "A mistrial is a drastic remedy to be exercised only in those extraordinary circumstances in which the prejudice to the defendant cannot otherwise be removed." *Id.* Because the circuit court is in the best position from which to evaluate whether an incident had a prejudicial effect on the jury, the decision to grant a mistrial is left to its discretion. *Id.* This Court reviews "for prejudice, not mere error, and we will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Norris,* 237 S.W.3d 640, 645 (Mo.App.2007).

Kameron Disciacca, the club manager, testified that, although the law requires the club only to allow patrons age 21 or older, the club preferred to limit admission to persons age 25 and older. He further testified that, whenever an individual enters the club, they are required to show identification, which is swiped through a security box that records the individual's information. The system records the date and time that the identification was scanned. Disciacca admitted that he was not the person scanning identifications on the night of the shooting but said that he knew that the scanner was off an hour because of daylight savings time. Last call at the club was at 2:30 a.m.

After the detectives began their investigation, Disciacca provided them with a compact disc that contained all of the identifications that had been scanned at the club on the night of the murder. Detective David Needham testified about the scanning device used at the club:

> [Prosecuting Attorney:]: And I know that we have talked about the surveillance videos. You weren't able to recover anything from the cameras. Was there another security device upon entering the club that Gerry's Silver Slipper had?
>
> [Needham]: Yes.
>
> [Prosecuting Attorney:]: And what was that?
>
> [Needham]: They have a deal where not only whenever you come in do they check your driver's license, but they have a computer system where they scan it and they save it in the computer. And they provided us with a copy of the CD or the disk from that night.

Needham stated that the records show that Taylor entered the club 11 seconds after Elvie Black. At that time, Needham

said that his investigation turned toward Taylor because Taylor's identification information matched the witnesses' descriptions.

On cross-examination, Needham again testified that Taylor's scanned driving license initially led the police to consider him as a suspect:

> [Defense Counsel]: ... So you're not saying that anyone witnessed Deonta Taylor walk through the bar with that ID. You certainly weren't there to take I.D.s that night, right?
>
> [Needham]: No, I was not. I was at home.
>
> [Defense Counsel]: So your statement that Deonta Taylor walked into the bar isn't entirely accurate. His license went into the bar 11 seconds after Elvie Black's driver's license?
>
> [Needham]: *I know that somebody verified that driver's license and then they checked the driver's license with the person and then they scan them to check them in.*[8]

Defense counsel then asked to approach the bench and objected to the detective's response as nonresponsive and hearsay because "not a single witness has testified here at all this week that they verified the driver's license next to Deonta Taylor's face." Outside the jury's presence, defense counsel then argued that the statement was prejudicial and grounds for a mistrial.

The State responded by arguing that the detective's response was part of the risk inherent in cross-examination because when "you ask the same question repeatedly ... a witness is going to feel the need to clarify." The State further argued that there was no prejudice: "it's nothing that is outside of the juror's common experience, .... I'm sure a portion of them have had their ID. checked where the person looks at it and looks at them and gives it back."

The court took a break to read the club manager's earlier testimony about the identification scanning process. After reviewing the testimony, the court questioned Needham:

> THE COURT: Do you or did you have any information from the investigation that was conducted in this case of who checked I.D.s or how that system occurred?
>
> [Needham]: I do know that Detective Babcock did speak with them that day and he's the one that initially got all the information and provided me with a copy of the disk. And I was informed that they checked the ID. at the door and then they scan it.
>
> THE COURT: Okay. And so that is what you were told by Detective Babcock from his interview?
>
> [Needham]: Right. When I was doing the crime scene he was speaking with the people that work inside the establishment.
>
> THE COURT: Okay. There has been no evidence here of anybody who has described exactly how the checking of I.D.s occurred or the scanning of I.D.s, except that I.D.s were taken and scanned, at least from what I have looked at here in reviewing the notes in real time. I will say that I think that the witness's response was probably from—partly from the press and the insistence of the questions that he was being requested. I am going to deny the motion for a mistrial at this time.

The court asked if Taylor wanted the answer stricken and defense counsel responded, "I don't know if it will do any

---

8. We added the emphasis.

good, but I certainly hope that you will do so, yes." Back in the jury's presence, the proceedings continued:

THE COURT: [T]he last question that was asked of Detective Needham had to do with the checking of I.D.s at the door, and I am instructing the jury to disregard the last answer that Detective Needham made at the conclusion of his testimony immediately before the recess regarding the checking of I.D.s. So I have stricken his answer from the record and I am instructing you to disregard the statement, that answer that was made by Detective Needham.

[Defense Counsel], you can ask your next question.

[Defense Counsel]: Thank you. Just to clarify for the jury, Detective, you had no personal knowledge if the I.D.s were compared to the person carrying the ID. and at the bar on that night; correct?

[Detective Needham]: No.

■ The circuit court did not abuse its discretion in denying Taylor's motion for a mistrial because of the detective's statement. The detective's statement about the general purpose of checking identification at the door of the club was not hearsay. " 'A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends upon the veracity of the statement for its value.' " *State v. Winfrey*, 337 S.W.3d 1, 6 (Mo. banc 2011) (citation omitted). There is no out-of-court statement in the detective's testimony. He said: "I know that somebody verified that driver's license and then they checked the driver's license with the person and then they scan them to check them in."

After hearing arguments from both attorneys and questioning the witness on his personal knowledge of the identification check, the circuit court found that the de-

tective's statement was inadmissible on the basis that the detective lacked personal knowledge. It then found no prejudice and denied Taylor's motion for a mistrial, but asked if Taylor wanted the court to strike the answer and instruct the jury to disregard the detective's response. Taylor responded affirmatively, and the jury was so instructed.

To show that the circuit court abused its discretion in denying his motion for a mistrial on the basis of inadmissible testimony, it is the defendant's burden to demonstrate how the testimony prejudiced him. *State v. Stewart*, 296 S.W.3d 5, 13 (Mo. App.2009). " 'Ordinarily a trial court cures errors in matters presented to the jury by instructing the jury to disregard the offending matter.' " *Id.* (citations omitted). This Court will not find error in a court's denial of a mistrial "[w]ithout a clear demonstration based upon specific references to the record related explicitly and coherently to relevant legal authority supporting that Defendant was actually prejudiced by [the] statement[.]" *Id.* An error does not reach the standard for prejudice unless there is a reasonable probability that the error affected the outcome of the trial. *Norris*, 237 S.W.3d at 645. " 'Generally, prejudice does not exist when the objectionable evidence is merely cumulative of other evidence that was admitted without objection and that sufficiently establishes essentially the same facts.' " *Id.* (citations omitted).

■ Taylor was not prejudiced by the detective's statement. After the court instructed the jury to disregard the statement, Taylor's next question and answer clarified that the detective in fact had no personal knowledge that the driving licenses were actually being verified at the entrance to the club. ("Just to clarify for the jury, Detective, you had no personal

knowledge if the I.D.s were compared to the person carrying the ID. and at the bar on that night; correct?").

Taylor alleges that the "follow-up question did little to alleviate the prejudice as it was obvious Needham had heard about the ID checking somewhere in the course of the investigation." As the State argued at trial, the concept of a club checking identification at the door, looking at it, and handing it back is "nothing that is outside of the juror's common experience[.]" Before Needham testified, the State presented evidence from the club manager who said that that every person who enters the club is required to show identification, which the club scans into its security system. The club manager further testified that although the law requires the club only to allow patrons age 21 or older, the club preferred to limit admission to persons age 25 and older.

It would be reasonable to infer that, to prevent underage patrons from entering unlawfully, the club had an interest in verifying that the patrons presented their own identification and not someone else's. Although there was no specific testimony from the club employee who checked identifications at the door, it would be reasonable for the jury to infer—even without Needham's statement—that the club checked each person's identification and compared it to the facial and physical characteristics of the person presenting it before allowing them into the club. Although the evidence showed that Taylor told the detective that his identification had been lost, it was up to the jury to weigh all of the evidence. With or without Needham's statement, it was reasonable for the jury to conclude that it was likely that Taylor was at the club on the night of the murders.

The circuit court was "in a superior position to determine the effect of the evidence and what should be done to cure the problem." *Norris*, 237 S.W.3d at 645. The circuit court's denial of Taylor's request for a mistrial was not clearly against the logic of the circumstances and so unreasonable as to shock our sense of justice or indicate a lack of careful consideration. The circuit court did not abuse its discretion when it declined to utilize the drastic remedy of declaring a mistrial. Point II is denied.

We, therefore, affirm the circuit court's judgment convicting Taylor of two counts of first-degree murder and two counts of armed criminal action.

All concur.