

# In the
# Missouri Court of Appeals
## Western District

STATE OF MISSOURI,

          **Respondent,**

v.

**TONY RAY KING,**

          **Appellant.**

**WD76667**

**OPINION FILED:**

**January 27, 2015**

---

**Appeal from the Circuit Court of Buchanan County, Missouri
The Honorable Randall R. Jackson, Judge**

**Before Division Four: Alok Ahuja, C.J. Presiding,
James Edward Welsh, J., and Patrick Campbell, Sp. J.**

Tony Ray King appeals his convictions, following a jury trial, for murder in the first

degree (§ 565.020),[1] child abuse in the first degree (§ 568.060), and arson in the second degree

(§ 569.050). We affirm the circuit court's judgment.

## Background

In January 2012, King was charged as a prior and persistent offender with first-degree

murder, felony child abuse, and second-degree arson. The State alleged (1) that on January 10,

2012, King had caused the death of his seven-year-old son (herein referred to as "Son") by

strangling or choking him, (2) that between November 16, 2011, and January 10, 2012, King had

---

[1]Statutory references are to the Revised Statutes of Missouri (RSMo) 2000, unless otherwise noted.

repeatedly physically abused Son, and (3) that on the morning of January 11, 2012, King had set fire to his mobile home in order to conceal Son's murder.

Viewed in the light most favorable to the verdict,[2] the evidence at trial showed that at the time of Son's death, he was living with King in a mobile home in rural Harrison County. Son attended school in Bethany and rode the school bus. King was involved in a custody battle with Son's mother, Mira Huffman, who lived in Bethany. Son began living with King in late August 2011 when King obtained an *ex parte* order of protection restricting Huffman's access to Son and granting King temporary custody.

After multiple postponements, a hearing was held on October 20th. The judge found a lack of evidence for a full order of protection and set aside the *ex parte* order. Following the hearing, Huffman picked Son up from school and took him to her home in Bethany. King traveled to neighboring Gentry County that same day and there obtained another *ex parte* child protection order. The next day, King came by and snatched Son out of Huffman's yard. When Huffman called King, he told her that she would never see her son again.

About a month later, just before the Thanksgiving break, Son's teacher, principal, and school counselor began noticing suspicious scrapes, bruises, and sores on Son. Based on these observations, and because Son was giving the educators differing explanations for the injuries, the school called the child abuse hotline. A caseworker and a deputy sheriff went to King's home to investigate. They observed Son's injuries, but the Children's Division ultimately concluded that his injuries were consistent with the stories that King gave them.

Son's teacher saw additional injuries on Son when he came back from the Thanksgiving break. From mid-November until the day of the fire, Son was in school only fifteen of the thirty-

---

[2]*State v. Taylor*, 298 S.W.3d 482, 491 (Mo. banc 2009).

two school days, and he attended only four of the fourteen school days in December. Over Christmas break, Son was injured again and was taken to Children's Mercy Hospital. King told Children's Mercy personnel that a tree fell on Son. When school resumed on Tuesday, January 3rd, Son was absent. When he returned the next day, he had numerous bruises on his face and a tear in the crease behind his ear. Son attended school on Thursday and Friday, the 5th and 6th.

On the 6th, King was notified that Son had been suspended from riding the bus for three days due to misbehavior. King called the school on the 9th, the first day of the bus suspension, and told them that Son would not be at school due to a counseling appointment. That evening, Son was with King when one of King's friends observed numerous bruises and injuries on Son. King told the friend that Son had gotten kicked off the bus and that he was going to take him home and "beat his butt" because of it.

The next day, January 10th, King called the school and stated that Son was going to be living with King's sister in Albany and that he would be going to school there. That same morning, King visited Robert Hunter at Hunter's apartment. Hunter looked into the cab of King's pickup as they talked and saw a small person lying on the passenger seat. The figure was entirely covered with a blanket except for his right hand and appeared to be about the same size as a seven-year-old child. Hunter asked King why he had his son with him. King said that Son was not feeling well and that he was going to take him to his (King's) sister's house. Hunter never saw the child move during the entire conversation.

On January 10th, King told another friend, Eric Bridger, that Son was staying with his sister. That evening, King's sister, Nicole Perry, called Bridger trying to find Son. Perry told Bridger that she had spoken with King and that King would not tell her where Son was.

3

On Wednesday, the 11th, between 6:30 and 6:45 a.m., David Baker and Tanner Henry arrived at the property where King's mobile home was located. They had been working at scrapping metal on the property since Monday. When they arrived on Wednesday, they saw King sitting in a pickup truck that had a trailer attached. King borrowed a log chain from the two men. Baker and Henry then drove down over the crest of a hill and started working about a quarter-mile away. Five or ten minutes later, King brought the chain back and told them that he was going to take his trailer to a tire shop a couple of miles away. During the two days that the two men had been there working, they had not seen Son, nor did King ever discuss him. This time, however, King told them that Son was in the house sleeping and asked them to tell Son where King had gone was if they should see him.

When King arrived at the tire shop at around 6:50 a.m., Brent Nible was there with his children waiting for the school bus. King told Nible that he was leaving his trailer at the shop. He also told Nible that Son had gotten kicked off the school bus and so he would have to take him to school. The school bus arrived at around 6:57 a.m., and Nible left.

Shortly before 7:00 a.m., Baker and Henry noticed smoke coming from the vicinity of King's mobile home. Baker drove up the hill and saw that the mobile home was on fire. He honked the horn to alert Henry, and Henry started up the hill on foot. Baker found King at the front door of the mobile home. King had a sweatshirt wrapped around his face and apparently was trying to get inside. King said that he had lost his phone, so Baker called 911. King then told Baker, "My son's in there." When Henry arrived, he and Baker repeatedly asked King where his son was located. King simply pointed in the general direction of the flames. While Baker and Henry tried to get into the home, first at one end and then the other, King calmly sat in his pickup. Henry broke out a window, and he and Baker shouted into the mobile home. They

4

asked King for his son's name three or four times before King told them. Baker and Henry then shouted Son's name but received no response. At one point, King futilely rammed his truck into the frame of the mobile home several times, but Baker and Henry observed that he did not speak or display any emotion.

Deputy Joe Hamilton arrived at the scene at approximately 7:15 a.m. and saw that flames and heavy smoke were coming from the center of the mobile home. Baker and Henry both observed that after Hamilton arrived, King then became emotional and began to cry. Hamilton asked King where his son might be in the mobile home. King said that he was in a bedroom in the southeast corner. King then went to the east end of the home and broke out a window. It was not possible to get in the window due to the smoke and fire coming out. King told Hamilton that Son had been awake and dressed that morning but that he did not want to go with King to the tire shop, so he left Son at home. King stated that he had filled his two wood stoves with wood before he left, and when he returned a short time later, the house was on fire.

When the fire crew arrived at approximately 7:33 a.m., the center portion of the mobile home was completely destroyed by fire and the remaining portions of it were fully involved. After putting out the fire, firefighters found Son's body in his bedroom at the east end of the mobile home. He was lying facedown on what remained of his bed.

In the midst of all this, Son's mother was driving by King's residence to show her brother where Son was living. As they drove near, Huffman saw smoke, and when they topped the hill, she saw that the smoke was coming from the mobile home. Huffman got out of her car and headed up the driveway asking for Son. A police officer stopped her and told her that Son was already gone.

5

After the fire that day, King went to the home of Eric Bridger and Bailey Hutchins to clean up. Hutchins overheard King say that he needed to get rid of two gas cans.

The fire investigator testified that he found no accidental causes for the fire. He was unable to determine a specific cause, but noted that the fire progressed faster than he would have expected. He did not find evidence of any accelerants, but, given the short time frame and the amount of damage from the fire, he suspected that accelerants had been used.

The toxicologist, Dr. Christopher Long, testified that the carbon monoxide levels in Son's blood were less than 10%, which is within the normal range. He stated that 40% is generally the minimum level of carbon monoxide saturation required to cause death.

Dr. Keith Norton performed the autopsy and found extensive burning of Son's body. Only portions of the right side of the body had not been burned. He found a number of bruises on Son's body and injuries to his organs, but he found no soot in Son's trachea or lungs. Dr. Norton determined that Son was dead before the fire started. Dr. Norton concluded that Son did not die from smoke inhalation, but rather from a lack of blood flow to the brain "probably" due to manual strangulation.

The jury found King guilty of first-degree murder, felony child abuse, and second-degree arson. The court sentenced King to life without the possibility of parole for the murder and two fifteen-year prison sentences for the abuse and arson counts, all to be served consecutively.

## Discussion

King raises six points on appeal. His first three points challenge the sufficiency of the evidence to support the jury's findings of guilt as to all three convictions. In reviewing the sufficiency of the evidence, we accept as true all evidence and inferences favorable to the State, and we disregard all evidence and inferences to the contrary. *State v. Crawford*, 68 S.W.3d 406,

407-08 (Mo. banc 2002).  Our review is "limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt."  *Id*. at 408.  When reviewing the sufficiency of the evidence to support a criminal conviction, we do not act as a "super juror" with veto powers, but we instead greatly defer to the jury's findings.  *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011).

### Point I:  First-Degree Murder

In Point I, King contends that the circuit court erred in overruling his motion for acquittal on first-degree murder because the evidence established only that Son "probably died from manual strangulation," without any other corroborating evidence, and mere speculation about the cause of death, without more, is insufficient to support a conviction for first-degree murder.

"In considering the sufficiency of the evidence, there must be sufficient evidence of each element of the offense."  *State v. Dixon*, 70 S.W.3d 540, 544 (Mo. App. 2002).  The elements of first-degree murder are derived from section 565.020.1, which states:  "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter."  Thus, in order to convict King of first-degree murder, the jury had to find that he caused the death of Son by strangling him, that he knew his conduct was practically certain to cause the death, and that he caused Son's death after deliberation.

At trial, the doctor who performed the autopsy, Dr. Norton, told the jury that the probable cause of Son's death was manual strangulation.  He testified that Son had bruises along the right side of the chin line and jawline, one closer to the chin, and further back closer to the ear.  The bruises appeared to be recent, having occurred within twenty-four hours.  There were also recent bruises just above and below the right collarbone, which, Dr. Norton explained, is an area that children are not likely to injure while playing.  There were also bruises on the neck consistent

7

with having been strangled or choked, and there was bruising in the tissues around and behind the larynx. Significantly, Dr. Norton found no soot in the trachea or lungs. Dr. Norton concluded that the cause of death was "probably lack of oxygen to the brain secondary to not enough blood flow to the brain related to the pressing – the compression of the blood vessels in the neck."[3] The bruising in the neck indicated blunt force injury to the neck, and the lack of any other cause of death indicated that the cause of death was manual strangulation. Dr. Norton testified that it takes a minimum of ten seconds of strangulation in order for someone to become unconscious and that it likely would take another one to two minutes for death to occur.

The toxicology results showed that the carbon monoxide saturation in Son's blood was less than 10%, which is within the normal range, and was nowhere near the minimum 40% required to cause death. This, along with the evidence that there was no soot in Son's trachea or lungs, established that Son was dead before the fire started.

King faults Dr. Norton for testifying that the victim "probably" died from manual strangulation, but Dr. Norton's opinion did not have to be absolute for the evidence to be sufficient. *See State v. Carter*, 670 S.W.2d 104, 106-07 (Mo. App. 1984) (where medical examiner concluded, by process of elimination, that the victim died by asphyxiation but could not positively state the cause of death, the court held that the doctor's inability to positively determine the exact cause of death was only a factor for the jury to consider). Here, there was evidence that corroborated Dr. Norton's finding of causation. He testified that he saw bruises on the neck consistent with the child having been strangled or choked. There was bruising in the tissues around and behind the larynx. These bruises became visible as Dr. Norton laid back the

---

[3]Dr. Norton opined that another possible cause of death could have been blunt force trauma to the head but that, due to the condition of the head, that would be impossible to determine.

muscles layer by layer in the course of the autopsy. The bruising in the neck indicated blunt force injury to the neck, and the lack of any other cause of death indicated that the cause of death was manual strangulation. This was sufficient evidence to prove that Son was murdered.

The circumstantial evidence also supports the jury's finding that King knowingly caused his son's death. In October, King took Son from his mother and told her that she would never see him again. Over the course of the next few months, while in King's custody, Son was seen at school with suspicious injuries and bruises, and he was often absent from school. After King was notified on January 6 that Son had lost his bus privileges, Son was never in school again. On the evening of January 9, King told Kelly Davis that Son had gotten kicked off the bus and that he was going to take Son home and "beat his butt." On January 10, King called the school and stated that he was taking Son out of school. That same day, Robert Hunter saw Son's motionless body in the cab of King's truck covered with a blanket except for one hand. King told Hunter that he was going to take Son to his sister's house, and he told Eric Bridger later that day that Son was at his sister's house. That evening, King's sister called Bridger asking if he knew the whereabouts of Son. She said that King would not tell her where Son was. Additionally, King repeatedly contradicted himself on the morning of the fire. He made a pointed effort to ask Baker and Henry to tell Son that he was at the tire shop. His story to Deputy Hamilton was that he told Son that morning that he was going to the tire shop. King told Brent Nible that he would have to take Son to school because he had gotten kicked off the bus. After the fire, King told Baker that he told Son that morning that he "wasn't going to make him go to school, so he could go back to sleep until I got this trailer fixed, and then I'd come back and get him out, and he could go with me to St. Joe." Also, Baker and Henry both testified about King's lack of cooperation in helping them find and rescue Son from the fire and about the change in King's

9

behavior once law enforcement arrived. After the fire, Bailey Hutchins heard King say that he needed to get rid of two gas cans.

The foregoing evidence is sufficient for a reasonable juror to find that King knowingly caused Son's death by strangling him. There also was sufficient evidence for the jury to find "deliberation." The jury was instructed that "deliberation" means "cool reflection" upon a matter "for any length of time no matter brief." § 565.002(3). Dr. Norton's testimony that it would take one to two minutes for a person to die from strangulation satisfied that definition.

In sum, the court did not err in denying King's motion for acquittal because the evidence was sufficient for a reasonable juror to find King guilty of first-degree murder. Point denied.

### Point II: Child Abuse

In Point II, King contends that the circuit court erred in overruling his motion for acquittal as to first-degree child abuse because the State's evidence consisted of nothing more than speculation that Son's injuries resulted from abuse at the hands of King, and such circumstantial evidence is insufficient to support a conviction for first-degree child abuse.

Under the relevant statute, "[a] person commits the crime of abuse of a child if such person [k]nowingly inflicts cruel and inhuman punishment upon a child less than seventeen years old[.]" § 568.060.1(1). Here, the State alleged that on or between November 16th, 2011, and January 10th, 2012, King struck Son "with such repetition and force as to leave bruises and abrasions on [him]," that, in so doing, King "inflicted cruel and inhuman punishment upon [Son]," that Son was "less than seventeen years old," and that King "knew his conduct was inflicting cruel and inhuman punishment upon [Son]."

The following evidence of child abuse was presented at trial. Kelly Davis testified that sometime in September or October 2011, he was with King when he saw King slap or hit Son.

10

Davis did not believe that was appropriate discipline, and he warned King that he had "better not ever see that happen again."

In November, Son's teachers and counselors began noticing suspicious injuries on him. On November 16, the school principal noticed a bump on Son's forehead. About a week later, Son was having behavioral problems, and the school nurse called King to ask if Son had taken his medication that morning. Within minutes, King came to the school, talked to Son, told him to apologize to the class, and requested that Son be kept in from recess as punishment. The next day, when Son came to class, he had purple splotches under his right eye and a purple or pink mark in the left corner of his eye. Son said that another student had accidentally punched him. As the day progressed, a bruise appeared on Son's right cheek and left forehead. Son told the school nurse that he got the injuries by falling at his house. Son told the principal that another boy in his class had caused the injury, but he then said that he did not know how it happened. He told the school counselor that he got his injuries in a fight with another boy and later said that he had fallen down the stairs.

The school counselor was concerned because Son gave different stories about what had happened to him. By November 29, the injuries had worsened, the bruising was darker, and Son had scratches around his eyes and his neck. Son also had a large infected rip in the crease behind his ear. The principal called the child abuse hotline. In response to the hotline call, a Children's Division worker went to King's home and observed the injuries on Son. Son told the worker that he got hurt on the playground and that the scratch marks were from a child on the school bus.[4]

---

[4]King notes that the Children's Division found the abuse allegations to be "unsubstantiated." In reviewing for the sufficiency of the evidence, however, we view the evidence in the light most favorable to the jury's verdict.

On December 1, Son's teacher, Jamie Carter, spoke with King. King told her that someone from the Children's Division had visited his home regarding Son's injuries. King said that Son told him that he had fallen at school. Carter told King that she did not recall that happening and said that Son had given several different stories as to how he got his injuries. King stated that Son often lied and that he tended to become a target when playing with other children. Carter told King that she disagreed and that she had not observed that.

Son was only in school three out of fourteen days in December. He was out of school the entire week of December 5th. When he returned to school on December 12, he had a red spot in his left eye. Son said that he had poked himself in the eye with a stick. Son was in school December 12 and 13, but was absent the rest of the week.

After the Christmas break, school resumed on January 3, but Son was not in attendance. The school was told that a tree had fallen on Son and that he was in the hospital. When Son returned to school on January 4, he had numerous large bruises on his face and a tear in the crease behind his *other* ear. Carter thought that Son "looked like a walking zombie." In addition to saying that a tree had fallen on him, Son also reported that some kids had gotten BB guns for Christmas and shot him in his butt and back.

On January 9, three days after King was told that Son had lost his bus privileges, Kelly Davis noticed that Son had bruises on his neck and stomach. Davis asked Son if his father had done that, and Son said no. Before leaving, King told Davis that Son had gotten kicked off the bus and that he was going to take Son home and "beat his butt." On January 11, Son's body was found in King's burned mobile home; Son had been strangled to death.

As noted, Dr. Norton found that Son had recent bruises along the right side of his jaw line, one closer to the chin, and one further back closer to the ear. In addition to the bruises on

12

and around Son's neck and collarbone and the bruising in the tissues around and behind the larynx, there also were bruises on his right arm that were consistent with having been grabbed very hard. Dr. Norton also found bloody fluid and pus in Son's chest cavity, which indicated inflammation that had existed for some time and could have been caused by blunt impact to the chest. There was also bleeding around the right lung and bruising behind the belly cavity, both of which also could have been caused by blunt impact.

King argues that this evidence is insufficient to support his conviction for child abuse because it does not prove that he caused the bruises or that the injuries were anything more than accidental. We disagree. The circumstantial evidence in this case was sufficient to establish King's guilt of child abuse beyond a reasonable doubt. "The State may prove its case by presenting either direct or circumstantial evidence [as to] each element of the crime." *State v. Jones*, 296 S.W.3d 506, 509 (Mo. App. 2009). "Circumstantial evidence is given the same weight as direct evidence and the jury is free to make reasonable inferences from the evidence presented." *Id*. "Circumstantial evidence alone can be sufficient to support a conviction." *State v. Jackson*, 439 S.W.3d 276, 278 (Mo. App. 2014).

Here, a reasonable juror could infer from the evidence presented that King was injuring his son, was lying about how the injuries occurred, was instructing his son to lie about how the injuries occurred, and, when the school and Children's Services became concerned, pulled his son out of school. This evidence, combined with the fact that King was heard threatening to take Son home and "beat his butt" and had been seen inappropriately physically disciplining his son before, was sufficient evidence for a reasonable juror to find King guilty of child abuse.

13

Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence from which a reasonable juror could find that King inflicted cruel and inhuman punishment on Son and was guilty of felony child abuse. Point denied.

### Point III: Arson

In Point III, King contends that the circuit court erred in overruling his motion for acquittal as to second-degree arson because the State's evidence consisted of mere speculation that King set the fire, and such circumstantial evidence is insufficient to support a conviction of second-degree arson.

A person commits second-degree arson "when he knowingly damages a building or inhabitable structure by starting a fire or causing an explosion." § 569.050.1. To make a submissible case, the State must prove that a building was on fire, the fire was of an incendiary origin, and the defendant participated in commission of the crime. *State v. Bolds*, 913 S.W.2d 393, 397 (Mo. App. 1996). "Arson is a crime usually committed in stealth and seldom in the view of witnesses and, hence, guilt must ordinarily be proven by circumstantial evidence." *State v. Simpson*, 606 S.W.2d 514, 518 (Mo. App. 1980). "All elements of arson may be proven by circumstantial evidence." *Bolds*, 913 S.W.2d at 398. Circumstances need not be absolutely conclusive of guilt and need not demonstrate impossibility of innocence. *Id.*

Here, the State alleged that on or about January 11, 2012, King knowingly damaged an inhabitable structure and that he did so by starting a fire. King claims that the State failed to prove that the fire was of incendiary origin. We disagree. Evidence of an incendiary origin does not require that there be proof of some highly combustible material. *State v. Paglino*, 291 S.W.2d 850, 857 (Mo. 1956). For a fire to be incendiary, there need only be some evidence, direct or circumstantial, that the person charged intentionally set the property on fire. *Id.*

14

At trial, the State presented the testimony of fire investigator Mark Fechtig. He testified that when he arrived on the scene at around 9:00 a.m., the mobile home was about three-quarters destroyed by fire. His investigation revealed no accidental cause for the fire. The two wood stoves were in good condition. There was no indication that the fires had started either in the stoves or in the flue pipes. Fechtig found that the breaker box was still intact. Because the breaker box was found in a portion of the mobile home that was still standing, Fechtig concluded that the fire had not originated there. Fechtig was unable to determine a specific cause of the fire but noted that it progressed faster than he would have expected. Fechtig did not find evidence of any accelerants, but given the time line of the fire, he would not have expected any evidence of accelerants to remain. Moreover, given that the fire took only about fifteen to twenty minutes to burn the home, Fechtig believed that an accelerant of some sort was used. Fechtig's testimony constituted sufficient evidence that this fire was incendiary in nature.

The circumstances surrounding the fire also support the jury's finding that King set the fire. On the morning of the fire, King told Baker and Henry that his son was sleeping in the mobile home and that he was going to the tire shop. While King was gone, Baker and Henry saw smoke and soon found that the mobile home was on fire. Both men found King's behavior that day to be inconsistent with what they would expect from a father under those circumstances, and they found him to be uncooperative in trying to help them save his son from the burning home. For example, when they repeatedly asked King where his son was in the mobile home, he simply pointed in the general direction of the flames, and he was slow in telling them Son's name. When Baker asked King if he had a water hydrant, or a chainsaw or ax so they could cut through the wall, King replied simply, "No, I don't have anything." Although King pointlessly rammed his truck into the frame of the home, he was not saying anything; nor was he screaming,

15

yelling, or crying. Henry observed that King did not begin to cry until Deputy Hamilton arrived. Baker also noticed that King became more emotional only after Hamilton arrived. Additionally, after the fire, King was overheard by a friend stating that he needed to get rid of two gas cans.

The foregoing evidence is sufficient to support the jury's finding that the fire was intentionally set and that King was the one who set it. King had both the opportunity and a motive to do so, in that Son's body was in the mobile home when it burned and the evidence shows that he was dead before the fire started. Thus, there was sufficient evidence for a reasonable juror to find King guilty of second-degree arson. Point denied.

### Point IV:  Instructional Error

In Point IV, King argues that the circuit court plainly erred in submitting the verdict director for first-degree child abuse (Instruction No. 8), in that the State presented evidence of several instances of alleged abuse but the verdict director failed to specify which act constituted the crime charged or to instruct the jurors that they must unanimously agree on the same act, thereby allowing the possibility that the jurors failed to unanimously find guilt as to the same act.

King concedes that he did not object to the instruction and thus failed to preserve this claim for review. Issues that were not preserved may be reviewed only for plain error under Rule 30.20. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009). Rule 30.20 authorizes this Court, in its discretion, to review "plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Our Supreme Court has established a threshold review to determine if a court should exercise its discretion to entertain a Rule 30.20 review of a claimed plain error. First, we determine whether or not the claimed error "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted[.]'" *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995)

16

(quoting Rule 30.20). If not, we should not exercise our discretion to conduct plain error review. If, however, we conclude that we have passed this threshold, we may proceed to review the claim under a two-step process pursuant to Rule 30.20. In the first step, we decide whether plain error has, in fact, occurred. *Baumruk*, 280 S.W.3d at 607. "All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious and clear." *Id*. In the absence of evident, obvious, and clear error, we should not proceed further with our plain error review. If, however, we find plain error, we must continue to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.* at 607-08. Plain error can serve as the basis for granting a new trial on direct appeal only if the error was outcome determinative. *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006).

Here, the verdict director as to child abuse, Instruction No. 8, read, in pertinent part:

As to Count III, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or between November 16, 2011 and January 10, 2012, . . . the defendant struck [Son] with such repetition and force as to leave bruises and abrasions on said child, and

Second, that in so doing, defendant inflicted cruel and inhuman punishment upon [Son], and

Third, that [Son] was then less than seventeen years old, and

Fourth, that defendant knew his conduct was inflicting cruel and inhuman punishment upon a child less than seventeen years old,

Then you will find the defendant guilty under Count III of abuse of a child.

Relying on *State v. Celis-Garcia*, 344 S.W.3d 150, 152 (Mo. banc 2011), King contends that this instruction erroneously failed to require the jury to unanimously agree upon which act of abuse King committed. In *Celis-Garcia*, the State presented evidence that the defendant committed

17

multiple criminal acts, similar in nature, against the same victim, but the verdict directors failed to differentiate between those acts so as to ensure that the jury unanimously convicted the defendant of the same act or acts. *Id*. at 156. There, the Supreme Court found plain error and reversed the defendant's convictions because it was "impossible to determine whether the jury unanimously agreed on any one of [the] separate incidents" such that "the verdict directors violated [the defendant's] constitutional right to a unanimous jury verdict." *Id*. at 158.

We find this case to be more akin to *State v. Miner,* 363 S.W.3d 145 (Mo. App. 2012), than to *Celis-Garcia*. In *Miner*, the defendant was charged with aggravated stalking based on the allegation that between two specific dates, he purposely harassed the victim "by repeatedly calling her and going to her home." *Id*. at 148. The *Miner* court explained that

> since Miner's threats constituted a course of conduct over the charged period of time, jurors needed only to agree unanimously over the period of time specified in the verdict director that his threats caused the victim to fear for her safety, rather than whether one specific threat did so. Thus, unlike in *Celis-Garcia*, here there is no risk that Miner's right to a unanimous jury was violated.

*Id*. The same is true here. As in *Miner*, the evidence in this case revealed a pattern of abuse, and it was this pattern of abuse that the jury had to find–*i.e*., *repetitive* strikes resulting in bruises and abrasions–not a single injury. By unanimously finding "repetition," it is apparent that the jurors agreed that King was guilty of the various acts committed during the specified dates.

In any event, instructional error rarely constitutes plain error. *State v. Smith*, 422 S.W.3d 411, 418 (Mo. App. 2013). For instructional error to constitute plain error, the circuit court must have "so misdirected or failed to instruct the jury that the error affected the jury's verdict." *State v. Dorsey*, 318 S.W.3d 648, 652 (Mo. banc 2010). The outcome of plain error review depends on the specific facts and circumstances of each case. *State v. Ralston*, 400 S.W.3d 511, 520 (Mo. App. 2013). In *Celis-Garcia*, the Court found prejudice for purposes of plain error review

18

because the defendant "relied on evidentiary inconsistencies and factual improbabilities respecting each specific allegation [of abuse]." 344 S.W.3d at 159. As explained in *State v. LeSieur*, 361 S.W.3d 458, 465 (Mo. App. 2012):

> *Celis-Garcia* makes clear that, to establish manifest injustice based on an insufficiently specific verdict director in a "multiple acts" case, the defendant must have mounted an incident-specific defense, which would have given the jury a basis to distinguish among the various incidents mentioned in the evidence.

*Celis-Garcia* suggests, however, that where the defendant mounts "a unitary defense" to all the alleged actions, instead of a defense which distinguishes among the various acts, manifest injustice generally does not exist. *See id*. (citing *Celis-Garcia*, 344 S.W.3d at 159). Here, King's defense was the same for all of the alleged incidents of abuse: he denied that he ever abused his son. Thus, under *Celis-Garcia*, King's "unitary defense" makes it unlikely that individual jurors convicted him based on different acts. *See id.* (citing *Celis-Garcia,* 344 S.W.3d at 159). For that reason, we cannot find "that the verdict directors misdirected the jury in a way that affected the verdict, thereby resulting in manifest injustice." *Id*. (quoting *Celis-Garcia,* 344 S.W.3d at 159).

In sum, King fails to facially establish substantial grounds for believing that a manifest injustice resulted from the giving of Instruction No. 8, the verdict director for child abuse. Point denied.

### Points V and VI: Rulings on Admission or Exclusion of Evidence

In Points V and VI, King contends that the circuit court erred in ruling on the admission and exclusion of certain evidence. "A trial court has broad discretion to admit or exclude evidence at trial," and its decision will be reversed only for a clear abuse of discretion. *State v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006). A court abuses its discretion when its ruling "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of

19

careful consideration." *Id*. There is no abuse of discretion if reasonable persons can disagree about the propriety of the decision. *State v. Raines*, 118 S.W.3d 205, 209 (Mo. App. 2003).

In Point V, King argues that the circuit court abused its discretion in overruling his objections to the toxicologist's testimony that the carbon monoxide levels in Son's blood would not have resulted in death. He contends that there was "an inadequate foundation for the chain of custody of the critical blood evidence," in that the State failed to prove that the blood sample tested was taken from the iliac artery. King claims that without this evidence, the jury would have had a reasonable doubt about whether Son perished prior to the fire.

The gist of King's complaint here is that Dr. Christopher Long's testimony about the carbon monoxide levels in Son's blood should not have been admitted because the evidence failed to establish that the blood he tested came from an iliac blood vessel[5] (as opposed to the heart). The evidence at trial showed that Shawn Parcells and Nate Pryer assisted Dr. Norton at the autopsy. Parcells testified that Dr. Norton had previously instructed him that blood samples should be taken from a periphery vein or artery (such as from a leg or arm), and not from the heart. Parcells testified that he saw Dr. Norton draw the blood from the right iliac artery or vein and that this blood was sent to Dr. Long for testing. Because that sample was not very big, they also took a sample of clotted blood from the heart.

Pryer testified that he packaged all the samples collected using a prepackaged kit. He also testified that he saw Dr. Norton draw blood from the iliac artery with a syringe and put it into a bottle. Pryer then sealed and labeled that bottle. Pryer identified that bottle of blood at trial. Blood clots from the heart were put into a separate bottle and sealed, he said. Pryer stated

---

[5]Dr. Norton explained that the iliac blood vessels are those that run from the pelvic area down into the legs.

20

that the sealed bottles were placed in biohazard bags, then put into a box sealed with evidence tape and sent to Dr. Long in St. Louis via a FedEx clinical pack.

Dr. Long testified that he received the items from FedEx on January 13, 2012. Before Dr. Long could testify about the toxicology results, defense counsel objected on the basis that a proper chain of custody had not been established. Defense counsel argued that Dr. Norton had not yet testified that he was the one who drew the blood and noted that, at his deposition, Dr. Norton never mentioned getting blood from an iliac vessel. The prosecutor responded that two witnesses had testified that Dr. Norton drew the blood from the iliac vein or artery and that he expected Dr. Norton to say the same. The court overruled the objection. Dr. Long thereafter testified that he tested the iliac blood sample and found that its carbon monoxide content was within the normal range, indicating that the victim had not died of smoke inhalation.

Dr. Norton testified that his statement in the deposition that the blood was drawn from the heart was not correct. He stated that his usual practice is to get blood from the iliac vessels and that either he or his assistant would do the blood draw. Dr. Norton did not have an independent recollection as to who drew the blood in this case, but he confirmed that the blood came from the iliac vessels. On cross-examination, Dr. Norton agreed that both his diagrams and the final autopsy report indicated that the blood came from the heart. Defense counsel then renewed his objection to the toxicology results. The court overruled the objection, finding that the testimony of the other witnesses established that the blood was drawn from the iliac region. The court did not err in overruling the objection. Whether a sufficient foundation has been established for an exhibit is a decision within the circuit court's discretion. *State v. Minner*, 256 S.W.3d 92, 97 (Mo. banc 2008). The determination as to whether a sufficient chain of custody has been established for an exhibit also lies within the court's sound discretion. *State v. Link,* 25 S.W.3d

21

136, 146 (Mo. banc 2000). Here, the testimony presented was sufficient to lay a foundation as to where the blood came from and to establish a chain of custody for the blood tested by Dr. Long.

King claims, nevertheless, that the testimony of Parcells was "inherently unreliable" due to "overwhelming evidence" that he has engaged in unethical conduct in other autopsies and that Pryer's testimony was unreliable because he works for Parcells. The only evidence at trial related to this issue was defense counsel's cross-examination of Parcells as to whether he had once signed a doctor's name in another criminal case. Parcells claimed that he had no knowledge of that. Thus, the jury had the opportunity to assess Parcells' credibility on that issue and to factor it into their deliberations. Credibility determinations are for the circuit court and the jury, and we defer to those findings. *See State v. Mignone*, 411 S.W.3d 361, 363 (Mo. App. 2013).

In any event, we review "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Forrest,* 183 S.W.3d at 223-24. Thus, an evidentiary error would require reversal only if it were prejudicial to King. *See Nash*, 339 S.W.3d at 515. "An error is not prejudicial if there is no reasonable probability that it affected the outcome of the trial." *Id*. King cannot show that this evidence, even if erroneously admitted, affected the outcome of the trial. The toxicology report was not the sole evidence establishing that Son did not die in the fire. The State otherwise established that fact via the (perhaps even more persuasive) evidence that no soot was found in Son's trachea or lungs.

In sum, a sufficient foundation and chain of custody was established for the blood evidence, and the circuit court did not err in admitting Dr. Long's testimony. Point denied.

In his final Point, King argues that the circuit court abused its discretion in excluding evidence of Mira Huffman's statements to Naomi Hilliard on the day of the fire. King contends

22

that this evidence established a "direct link" between Huffman and the fire and death of Son and, thus, was necessary to his defense.

King presented the testimony of Hilliard in an offer of proof. Hilliard testified that on January 11, 2012, she and Huffman were sharing a house in Bethany. Hilliard stated that she received phone calls from Huffman that morning, which she did not answer, and that the first one was at 6:50 a.m. She said that Huffman later came into her bedroom and awoke her, screaming that she had been out to King's, that her son was on fire, and that King had killed him. Hilliard believed that this conversation occurred at about 7:00 a.m. Hilliard stated that they then went downstairs, and the house was full of people. On cross-examination, Hilliard acknowledged that the phone calls she had received were on her cell phone, and she was confident that Huffman did not come into her room until *after* the phone calls. Phone records revealed that the phone calls from Huffman to Hilliard's cell phone did not occur until 7:35 a.m. Under questioning by the court, Hilliard stated that it was Huffman's family members who were in the house when they went downstairs and that they all knew about the fire and about what had happened to Son. The circuit court sustained the State's objection, finding that there was no direct evidence tying Huffman to the crimes and that King's proffered evidence was speculation and conjecture.

"Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible without proof that such other person committed some act directly connecting him with the crime." *State v. Schaal*, 806 S.W.2d 659, 669 (Mo. banc 1991). "Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible." *Nash*, 339 S.W.3d at 513.

23

King's proffered evidence did not establish a direct connection between Huffman and the arson or the murder. Huffman arrived on the scene well after the fire was set, and there was no evidence that she was at the scene prior to the fire being started. Moreover, there is no evidence that Huffman had access to Son at the time of his death and, thus, no evidence to tie her to his murder. Because King's offer of proof did not meet the standards of the "direct connection rule," the circuit court did not abuse its discretion in excluding it. Point denied.

## Conclusion

Based on the foregoing, we affirm King's convictions and sentences.

/s/ JAMES EDWARD WELSH
James Edward Welsh, Judge

All concur.