**STATE of Missouri, Plaintiff/Respondent,**

v.

**Edward BATTLE, Defendant/Appellant.**

**No. ED 99176.**

Missouri Court of Appeals, Eastern District, Division Two.

Dec. 17, 2013.

Daniel N. McPherson, Jefferson City, MO, for Plaintiff/Respondent.

Maleaner R. Harvey, St. Louis, MO, for Defendant/Appellant.

SHERRI B. SULLIVAN, J.

*Introduction*

Edward Battle (Appellant) appeals from the trial court's judgment convicting him of the class C felony of second-degree domestic assault as a prior and persistent offender. We affirm.

*Factual and Procedural Background*

The state charged Appellant with one count of second-degree domestic assault (felony), Section 565.073 [1] and one count of third-degree domestic assault (misdemeanor), Section 565.074, as a prior and persistent offender. The evidence adduced at trial, in the light most favorable to the verdict, is as follows.

On May 23, 2011, the victim, D.W., and Appellant had been in a romantic relationship for approximately six months. Appellant occasionally stayed at D.W.'s apartment. That morning, D.W. was at home with her friend Craig Miller (Miller). Miller needed a place to stay for the night and asked D.W. if he could stay with her. D.W. told Miller to get Appellant's permission, and Appellant agreed that Miller could stay. Appellant sent Miller to the store to buy alcohol and the two drank beer throughout the day. Appellant was agitated and argued with D.W. over financial matters and sex. At some point, D.W. got up to go into another room and Appellant pushed D.W., ripping her shirt.

Around 4:00 p.m., D.W., tired of Appellant's badgering, left the apartment with Miller. They went to the store, where D.W. bought a can of beer. D.W. and Miller sat on a park bench near D.W.'s apartment drinking the beer and waited for Appellant to leave for work. At approximately 7:00 p.m., D.W. and Miller walked back to the apartment. D.W. asked Miller to go inside and check to see if Appellant was there. From outside the apartment, D.W. could hear arguing and decided to call the police to have Appellant removed from the apartment. D.W. walked to a nearby bar and used their phone to call the police. When the police did not arrive, she called the police again.

After making the second call, D.W. stepped outside the bar so the police could see her when they arrived. D.W. testified that while waiting outside, Appellant came out of her apartment building and saw her. D.W. stated Appellant immediately attacked her, using both hands to strangle her and asked her where his money was. D.W. told Appellant she did not know where his money was and asked him to let her go. D.W. told Appellant, "I can't breathe, Eddie. You're going to kill me. You're going to kill me." D.W. testified Appellant would not let go and she could not remove his fingers from her neck so she tried to scream. D.W. stated Appellant choked her for a minute or two. D.W. testified she was beginning to lose consciousness when someone came outside from the bar and she was able to get free from Appellant. The police arrived shortly after. D.W. testified Detective Deirdre Henderson (Detective Henderson) asked her if she needed to go to the hospital but D.W. refused because she did not think she was injured severely enough and she did not have insurance and could not afford to go.

Rebecca Rainwater (Rainwater) was working at the bar when D.W. came in and used the phone to make two calls. Rainwater testified that after D.W. used the phone the second time, D.W. went outside to wait for the police to arrive. Sometime after that, Rainwater heard a very faint cry for help. Rainwater called 911 and then went outside and glanced around.

1. All statutory references are to RSMo.2006.

Across the street, Rainwater saw Appellant and D.W. Appellant had his arm around D.W.'s shoulder and one hand on her throat. D.W. appeared to be very distressed. Rainwater said, "Hey, let her go[,]" and D.W. broke loose from Appellant and ran behind Rainwater. Appellant turned and looked at Rainwater. Appellant appeared very angry and started walking toward her. Seconds later, the first police officer arrived. Rainwater testified D.W. did not appear intoxicated but seemed concerned and nervous when she asked to use the phone.

Detective Henderson arrived on the scene approximately thirty minutes later. Detective Henderson testified she has been a police officer for eight years and had been assigned to the Domestic Abuse Response Team for three years, working exclusively with violence between partners in intimate relationships. Detective Henderson testified D.W. was visibly upset and shaken, appeared to be intoxicated, was staggering, smelled of alcohol, and had difficulty relating and writing down what had happened. Detective Henderson observed red marks and scratches around D.W.'s neck but did not see any bruising. Detective Henderson stated that D.W. refused medical treatment.

Detective Henderson stated Appellant did not appear to be intoxicated. Appellant advised Henderson that after Miller returned to the apartment and told him where D.W. was, Appellant ran across the street, pushed her and yelled at her for stealing his money. Appellant stated "he was pissed" at her for taking his money but initially denied putting his hand on D.W.'s neck. When Detective Henderson asked Appellant about the marks on D.W.'s neck, Appellant stated that he may have put his hand on her neck but did not push her.

Detective Henderson further testified as follows:

Q [The Prosecutor]. And you said you've been a detective with the DART unit for about three years, right?

A. Yes.

Q. And how many domestic violence cases involving strangulation do you think you've investigated?

A. Over—over fifty, seventy-five, somewhere between there.

Q. In your experience are the marks that you saw consistent with someone who had been strangled?

[Defense Counsel]: I'm going to object as far as foundation. She's not a medical expert to be able to testify to something like that.

THE COURT: I'm going to sustain the objection on the foundation. I think this witness can testify to the nature of injuries on that level, a very type of superficial level. However, I don't think a sufficient foundation has been laid.

[The Prosecutor]: May I attempt to rephrase, your Honor?

THE COURT: Sure.

[The Prosecutor]: Okay.

BY [The Prosecutor]:

Q. In your experience is that consistent with people who report a strangulation?

[Defense Counsel]: Same objection, your Honor. Still no more foundation.

THE COURT: Sustained.

. . .

Q. Okay. In your experience have you encountered people who have not requested medical attention?

A. Yes. Mostly—most of the time people don't request medical attention.

Q. And why is that, in your experience?

A. I think it's because they're scared or they don't think that they're severely injured until the next day when bruises start showing up or their throat hurts or—it's just—t's several different variations as to why.

Q. And [defense counsel] asked you something about bruising. How close in time did you arrive to the scene from when this incident supposedly happened?

A. Thirty minutes maybe.

Q. Is it common for—in your experience from what you've seen, is that—is it common to see bruising or something like that happening the next day?

[Defense Counsel]: I'm going to object again. Same thing as far as foundation. She's not a medical expert to be able to testify about bruising.

THE COURT: Overruled.

A. Bruising usually shows up the next day.

Q. So was it surprising to you that she did not have bruising?

A. No, not at all.

Q. But she did have scratching around her neck, right?

A. Yes, and she had like the red marks as well.

Appellant testified he went to sleep around 8:00 or 8:30 that evening and that when he awoke, D.W. and Miller were gone and $150 was missing from his wallet. Appellant testified he saw D.W. across the street and went outside to talk to her. Appellant stated when he asked her what happened to his money, she began screaming and beating him in the chest. Appellant stated he "put his arms around her" and grabbed her because she was intoxicated and fell into him. Appellant stated he put his arm around her neck because he was trying to help her across the street

and she could not stand on her own. Appellant denied pushing or choking D.W.

The jury found Appellant guilty on the felony charge of second-degree domestic assault and not guilty on the misdemeanor charge of third-degree domestic assault. On October 25, 2012, the court sentenced Appellant to fifteen years in prison as a prior and persistent offender. This appeal follows.

## Discussion

### Point I—Admission of Evidence

■ In his first point, Appellant argues the trial court abused its discretion in admitting, over defense counsel's objection, testimony from Detective Henderson that it is uncommon to see bruising thirty minutes after an incident and bruises on D.W.'s neck would not show right away but would appear the next day because Detective Henderson did not have medical training or expertise to testify about bruising and there was an insufficient foundation laid for such opinion testimony.

■ The trial court has broad discretion in determining the admissibility of evidence and this Court will reverse the trial court's judgment only upon a clear abuse of that discretion. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). The trial court abuses its discretion in the admission of evidence when the court's ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. *Id.* On appeal, we review the trial court "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.* at 223–224. Trial court error is not prejudicial unless there is a reasonable probability that the error affected the outcome of the trial. *Id.* at 224.

Here, Appellant likens Detective Henderson's testimony to expert medical testimony and argues no foundation was laid showing Henderson was qualified to testify as such. "Opinion testimony is generally inadmissible when the trier of fact is as capable as the witness to draw conclusions from the facts provided." *State v. Breedlove*, 348 S.W.3d 810, 816 (Mo.App. S.D.2011). "However, a witness who personally observed events may testify to 'his "matter of fact" comprehension of what he has seen in a descriptive manner which is actually a conclusion, opinion or inference, if the inference is common and accords with the ordinary experiences of everyday life.'" *Id.* quoting *State v. Davidson*, 242 S.W.3d 409, 414 (Mo.App. E.D.2007) (internal citation omitted).

Here, Detective Henderson testified she has been a police officer for eight years and has been assigned to the Domestic Abuse Response Team for three of those years, working exclusively with violence between partners in intimate relationships. Detective Henderson arrived on the scene approximately thirty minutes after the incident occurred and observed red marks and scratches on D.W.'s neck but no bruising. Detective Henderson stated that, in her experience, most alleged victims do not request medical attention "because they're scared or they don't think that they're severely injured until the next day when bruises start showing up or their throats hurt[.]" Further, Detective Henderson testified it was not surprising to her that D.W. did not have bruising thirty minutes after the assault because "[b]ruising usually shows up the next day." Detective Henderson's testimony did not purport to be expert medical testimony but instead was her opinion and personal observations based upon her extensive law enforcement experience. The trial court did not err in admitting Detective Henderson's testimony over defense counsel's foundation objec-

tion. See *Breedlove*, 348 S.W.3d at 816 (finding no plain error in the admission of officer testimony regarding the severity of bruising based on the officers' law enforcement training and the inference that the officers had more experience and knowledge than an ordinary lay person in recognizing excessive bruising, and the officer's personal observations). Appellant's Point I is denied.

### *Point II–Sufficiency of the Evidence*

In his second point, Appellant argues the trial court erred in denying his motion for judgment of acquittal at the close of all evidence because the State failed to make a submissible case as to Count I, second-degree domestic assault, by failing to prove Appellant attempted to cause physical injury to D.W. by choking her.

On review of a challenge to the sufficiency of the evidence, this Court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the verdict. *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011). All contrary evidence and inferences are disregarded. *Id.* We will affirm the conviction if the evidence was sufficient for a reasonable person to find the defendant guilty beyond a reasonable doubt. *State v. Roper*, 136 S.W.3d 891, 897 (Mo. App. W.D.2004).

Second-degree domestic assault occurs when a person "attempts to cause or knowingly causes physical injury ... by any means, including but not limited to ... choking or strangulation ..." to a family or household member. Section 565.073. Appellant asserts the State failed to present sufficient evidence that he attempted to cause physical injury to D.W. by choking her because Appellant testified that he simply put his arm around D.W.'s shoulder

and neck and that he grabbed her only to steady her because she was intoxicated and unsteady. Appellant's claim is without merit.

D.W. testified that shortly after exiting the bar Appellant saw her and immediately attacked her, using both of his hands to strangle her. D.W. stated Appellant choked her for one to two minutes, during which time she could not breathe and began to lose consciousness. D.W. testified she pleaded with Appellant to release her, told him she could not breathe and that he was going to kill her, and tried to scream for help. Rainwater testified she saw Appellant's hand on D.W.'s throat and that D.W. appeared to be distressed. Detective Henderson observed red marks and scratches on D.W.'s neck shortly after the incident occurred. Viewing the evidence in the light most favorable to the verdict, a reasonable trier of fact could find Appellant attempted to cause physical injury to D.W. by choking her. Appellant's Point II is denied.

## Conclusion

The judgment of the trial court is affirmed.

LAWRENCE E. MOONEY, P.J., and ROBERT G. DOWD, Jr., J., concur.