

# In the
## Missouri Court of Appeals
### Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | **WD86124** |
| | ) | **Consolidated with WD86125** |
| V. | ) | |
| | ) | **OPINION FILED:** |
| SHANE CHESHER, | ) | **NOVEMBER 5, 2024** |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Henry County, Missouri**
The Honorable Michael Brandon Baker, Judge

Before Division Four:  Anthony Rex Gabbert, Chief Judge, Presiding, Mark D. Pfeiffer, Judge and Gary D. Witt, Judge

Shane Chesher ("Chesher") appeals the judgment of the Circuit Court of Henry County, Missouri ("trial court"), convicting him, after a jury trial, of first-degree murder, section 565.020;[1] armed criminal action, 571.015; and unlawful possession of a concealable firearm, section 571.070.  Chesher was sentenced to life in prison without parole for first-degree murder, ten years' imprisonment for armed criminal action, and seven years' imprisonment for unlawful possession of a firearm, with the sentences to run consecutively.  Chesher raises two points on appeal:  Point I, the trial court abused its

---

[1] All statutory references are to the Revised Statutes of Missouri (2016), as updated by supplement through 2022, unless otherwise noted.

discretion in sustaining the State's motion to quash the subpoenas of three witnesses; and

Point II, the trial court abused its discretion in admitting details from Chesher's prior

conviction. We affirm the judgment of the trial court.

**Factual and Procedural Background**

Chesher was charged with committing: the class A felony of murder in the first

degree, section 565.020; the unclassified felony of armed criminal action, section

571.015; the class D felony of unlawful possession of a concealable firearm by a

convicted felon, section 571.070; and the class E felony of unlawful use of a weapon,

section 571.030. Before trial, the State dismissed Count IV, the unlawful use of a

weapon charge. Prior to trial, the trial court found Chesher to be a prior and persistent

offender. On December 12, 2022, a jury trial commenced. The jury found Chesher

guilty of all three counts. Viewed in the light most favorable to the verdicts, the evidence

presented at trial showed the following:

Chesher and G.K. ("Victim")[2] knew each other for roughly a decade and were first

introduced by a mutual friend. A few days before March 4, 2022, Victim showed up

unannounced to Chesher's house in Windsor, Missouri. While there, Victim asserted that

Chesher owed him money. Victim believed Chesher had stolen $5,000 from his home.[3]

Chesher saw Victim put his hand into his pocket and believed he saw something in

---

[2] Pursuant to section 509.520, RSMo. (2023), we do not include the victim's name or the names of witnesses other than parties.

[3] There was conflicting evidence presented at trial as to whether Victim believed Chesher stole $5,000 in cash or whether Victim believed Chesher stole a check for $5,000 that was made out to Victim which he received from a third party for the sale of a truck.

2

Victim's hand, but was not sure what it was. Chesher testified he was scared but did not call the police because he had outstanding warrants for his arrest. Following the incident, Victim called Chesher and left him the following voice messages, which were played for the jury:

> I'm going to tell you something, you little motherf*****r. Your family's not safe, your house, your car. There's nothing you own or that belongs to you, buddy. I'm coming. I'm going to burn, kill, and destroy. You got it?
> . . .
> You stupid, motherf****r. I'm gonna – I'm telling you, Shane. You ain't safe in the police station. Every f*****g thing you have, or ever seen, or wherever the f*** you – I'm coming. I'm coming, pal. And I'm going to bring more s*** than you ever seen in your life. You better get your dang [unintelligible], p****. You think I'm bulls******g, well watch and see. Your daughters, you better find a new place for them to go to school.

Chesher testified he was "nervous and scare[d]" when he heard the messages, and forwarded them to his mother who found the messages to be concerning.

On March 4, 2022, Victim and his friend, S.B., went to Chesher's house. S.B. drove Victim to Chesher's house because Victim believed Chesher stole money from him and that Chesher had agreed to pay Victim back. When the men arrived, Chesher was not home as he was driving his girlfriend ("Girlfriend")[4] to a job interview; however, Chesher's three stepdaughters were at his house. Victim got out of the car and knocked on the door while S.B. remained in the car. One of Chesher's stepdaughters ("Stepdaughter") testified that Victim was twisting the door handle, trying to get into the house, but Victim was unsuccessful. Chesher got a cellphone notification that someone

---

[4] Chesher and his girlfriend were subsequently married; however, for ease of reference we simply refer to her as Girlfriend throughout this opinion.

3

was outside his house and he ultimately returned home with a friend in the passenger seat of Chesher's blue Chevrolet Silverado pick-up truck. S.B. testified that Chesher came running over and put a gun on S.B.'s shoulder and then aimed it at Victim; however, Stepdaughter testified the whole interaction never got physical. At one point, Stepdaughter saw one of the men digging around in Chesher's truck. In Chesher's truck, there was a pink handgun which belonged to Girlfriend. Ultimately, Victim gained possession of the pink handgun. Chesher kept telling the men that the gun was Girlfriend's and that he needed to get it back. Victim tried to get back in S.B.'s car with the gun, but S.B. would not let him. Victim proceeded to walk away, down the street with the gun. S.B. testified that once Victim walked away Chesher told S.B. that he was "going to bump [Victim] with the truck." S.B. told Chesher to hold off and instructed him to go to Dollar General and wait for S.B. to tell him where the gun was; Chesher promised S.B. that he was going to wait. Chesher and his friend then got back in Chesher's truck and drove away.

Roughly forty minutes after this incident, the police were notified about a hit and run motor vehicle crash in Windsor. Victim was walking on the side of the road when Chesher ran into him with his truck; Girlfriend was in the vehicle when this happened. Victim was "thrown forward and . . . [he] did a flip and landed with his feet away from the road and his head toward the road in the ditch." Chesher alleged Victim saw his truck coming and Victim pointed a gun at Chesher's truck. Chesher thought Victim was going to shoot him, so Chesher panicked and hit Victim with the right side of his truck. Chesher testified he then got out of the truck, saw Girlfriend's pink handgun in Victim's

4

hands and hit Victim's chest twice with his foot to get him to release his grip on the gun. Chesher testified that once he retrieved Girlfriend's gun, he got back in the truck and drove off. Bystanders testified that Chesher stomped on Victim's chest, at least two times, then quickly returned to his truck and drove off before police and first responders arrived.

When police and first responders arrived at the scene Victim was on the ground, off to the side of the road in the ditch area. Victim was on his back and his right shoe was on the ground approximately three feet away from him. There was debris on the ground including plastic and metal items which appeared to be pieces from a vehicle including part of a broken headlight. Victim was having a difficult time breathing. Victim's eyes were open and he seemed alert as he was looking around; however, Victim was unable to speak. Victim was bleeding from his nose and there was a cut on his forehead above his right eye. A paramedic testified that Victim was posturing with his hands and arms which is typically associated with a serious brain injury. Further, Victim was rated five out of fifteen on the Glasgow Coma Scale[5], indicating that there were serious injuries reducing Victim's ability to protect his own airway in order to properly function. Victim was transported from the scene by ambulance and was then air-lifted to the closest Level 1 trauma center. Once Victim was in the ambulance, another paramedic noticed there was some instability in the back of Victim's skull. One day after the

---

[5] The scale is composed of three categories: eye response, verbal response, and motor skills. A score of fifteen would reflect a conscious, alert, and orientated person. The lowest score a person can get is three.

incident, a neurologist noted Victim had a very low chance of recovering, and if Victim were to stop breathing, medical personnel would not try to resuscitate him. On March 15, 2022, eleven days after Chesher hit Victim with his truck, Victim died from "complications of multiple blunt force injuries."

After Chesher struck Victim with his truck, Chesher and Girlfriend returned home, and Stepdaughter observed that both adults seemed worried. Chesher told the children to grab some things, and they all left, spending the night in a hotel. The following day, the children went to stay with their grandmother while Chesher and Girlfriend left town. At some point, Chesher removed the license plates from his truck and left the vehicle in the parking lot of a local automotive store. Chesher and Girlfriend then drove to Las Vegas, Nevada in a white Toyota Tacoma and got married.

Police were notified about the abandoned truck and identified Chesher as its owner. The truck's hood was dented, the passenger headlight was completely missing, the turn signal was missing, and some of the vehicle's grill was broken. The debris found at the scene of the hit and run matched the broken pieces that were missing from Chesher's truck. Police were unable to contact or locate Chesher right away; however, police were notified of a conversation Chesher had with his family, indicating that Chesher intended to turn himself in. Police were unable to track Chesher's cellphone because it was completely turned off; however, they were able to track Girlfriend's cellphone to western Kansas. On March 15, 2022, Chesher and Girlfriend were located by the Kansas Highway Patrol on I-70 near Colby, Kansas, heading east toward Missouri. Chesher and Girlfriend were placed under arrest. An inventory search of the vehicle

6

revealed two firearms, including a pink Ruger LCP, two cellphones, and a box for a prepaid cell phone.

One of the cellphones seized was activated in the late hours of March 4. There were roughly ninety calls with a number marked as "Mom;" this number matched Chesher's mother's number. On March 13 there were several Google searches made on the phone including: Missouri self-defense laws; "What happens if you plead insanity?"; second-degree murder; and "attempted murder charges and penalties."

At trial, Chesher's older sister ("Sister") testified about a text she received from Chesher on March 4. Sister is the legal guardian of Chesher's daughter. Chesher regularly sees his daughter and was supposed to pick her up from Sister's house on the night of March 4. However, Chesher texted Sister that he was not going to be able to get his daughter that night because something came up. Sister and Chesher spoke on the phone the following day, and Chesher told her that he accidentally hit somebody. Sister encouraged Chesher to come forward to police.

Chesher's former caseworker ("Caseworker") also testified at trial. Caseworker had received a video from Chesher that he took on his cellphone in the early afternoon of March 4 when Victim, S.B., and Chesher's friend were all at Chesher's home. Caseworker did not know the context of the video, so she unsuccessfully tried to get in contact with Chesher to talk to him. Caseworker eventually spoke with Chesher after he was arrested. During their conversation, Chesher never told Caseworker why he hit Victim with his truck, but stated "I wish you knew what happened," and that "they need to see my side."

7

Two medical professionals also testified at trial regarding Chesher's prior head injury. When Chesher was seventeen years old, he was hit in the head by a full beer bottle which caused a traumatic brain injury. Each medical professional opined as to the extent Chesher was impacted by his brain injury. One medical professional testified about diagnosing Chesher with a "major neuro-cognitive disorder." The other medical professional disagreed with this conclusion, opining that Chesher had "mild neuro-cognitive disorder" because he was not impaired to the extent that it impacts his function of daily life. This medical professional was the only one to evaluate Chesher's competency and his judgment skills, noting Chesher demonstrated "good abstract reasoning, good judgment, [and] problem-solving skills." Neither medical professional opined that Chesher was not mentally fit to stand trial.

At trial, the State admitted, over Chesher's objection, a certified copy of the criminal information from 2018 representing Chesher's charge, prior plea of guilty, and conviction for the felony of domestic assault in the second degree where Chesher "knowingly caused physical injury to [ex-girlfriend] by striking [her] in the face with a closed fist, and by means of a dangerous instrument by striking [her] with a motor vehicle . . . ." The information from the prior conviction was admitted into evidence and published to the jury. The State offered this evidence to prove under Count III that Chesher was a convicted felon making it illegal for him to possess a firearm. The State also argued the method by which Chesher committed the prior offense was admissible to assist the jury as it provided the full context of Chesher's intent and that his actions in hitting Victim with the vehicle on March 4, 2022, were of no mistake or accident.

8

The jury found Chesher guilty of murder in the first degree, armed criminal action, and unlawful possession of a firearm. The trial court sentenced Chesher to life in prison without the possibility of parole for first degree murder, ten years' imprisonment for armed criminal action, and seven years' imprisonment for unlawful possession of a weapon, with all sentences to run consecutively. This appeal follows.

**Standard of Review**

Both of Chesher's points on appeal argue that the trial court abused its discretion, first by quashing the subpoenas for three witnesses, and second for admitting the evidence from his prior felony conviction. "The trial court has broad discretion in determining the admissibility of evidence and this Court will reverse the trial court's judgment only upon a clear abuse of that discretion." *State v. Battle*, 415 S.W.3d 783, 787 (Mo. App. E.D. 2013). We will find a trial court abused its discretion, "only when a ruling is clearly against the logic and circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Mills*, 687 S.W.3d 668, 675 (Mo. banc 2024) (internal citations omitted). It cannot be said that a trial court abused its discretion if reasonable persons can differ about the propriety of the trial court's action. *See id.* We review "the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.* "Trial court error is prejudicial if there is a reasonable probability that the trial court's error affected the outcome of the trial." *Id.* (internal citation and quotations omitted).

9

**Motion to quash subpoenas**

### Analysis

In Chesher's first point on appeal, he asserts the trial court abused its discretion in sustaining the State's motion to quash the subpoenas of three witnesses because those witnesses would have testified about previous threats Victim made against Chesher, and Chesher had a right to present this evidence to show Victim was the initial aggressor given the fact that Chesher presented a self-defense theory at trial. We find the trial court did not abuse its discretion.

Chesher sought to introduce evidence from three witnesses—M.M., R.S., and R.B.— all of whom worked at the Henry County Prosecuting Attorney's Office. Chesher asserts these witnesses would have testified as to previous threats made by Victim. Specifically, at the beginning of 2022, Victim went to the prosecutor's office seeking to prosecute and/or figure out how he could get money back from a bad check. Victim's name was not on the check, and R.B. notified him that there was nothing that they could do because it was a civil matter since it was a third-party check. Victim was visibly upset, said "I'm going to kill him," and ultimately left the office. About a month later, Victim returned to the prosecutor's office with the same check. Victim told M.M. that he tried to cash the check, but it bounced, which was costing him a lot of money. Victim was again told that the prosecutor's office could not help him with the bad check. Victim was loud, noticeably mad, and kept saying "f***." Victim then said, "I'm going to kill that motherf****r." Victim was then asked to stop disrespecting the staff, and he ultimately left.

10

Before trial, the State moved to quash the subpoenas of M.M., R.S.,[6] and R.B. asserting that the witnesses cannot testify to any material or relevant facts. The State argued that while Victim made these threats there was no evidence that Chesher was aware of the threats. The trial court sustained the State's motion. At trial, Chesher objected to the trial court's previous ruling and submitted depositions from M.M. and R.B. as an offer of proof of their expected trial testimony. The trial court stood on its previous ruling and denied any evidence or admission of statements from M.M., R.S., and R.B.

At trial, in accordance with MAI-CR 4th 406.06, the jury was instructed to consider any previous threats Victim made to Chesher and that were known by Chesher, when determining who was the initial aggressor. Here, Victim's threats that Chesher sought to admit into evidence through the excluded witnesses were not made to Chesher, and Chesher was not aware of the threats until after March 4. Chesher thus concedes that these statements could not be used to show Chesher's state of mind or fear of Victim. Further, there was no evidence that the threats were directed at Chesher. Rather, Chesher argues these threats were admissible to show Victim's "state of mind" at the time Chesher struck Victim. We find the trial court did not abuse its discretion as the evidence was not relevant.

For evidence to be admissible, it must be logically and legally relevant. *See State v. Taylor*, 588 S.W.3d 632, 638 (Mo. App. W.D. 2019). "Evidence is logically relevant if

---

[6] Chesher did not make an offer of proof as R.S.'s expected trial testimony.

11

it tends to make the existence of a material fact more or less probable." *Id.* (internal quotation omitted). Logically relevant evidence is admissible only if it is also legally relevant, requiring its probative value to outweigh its prejudicial effect. *Id.* The evidence presented at trial indicated Victim believed Chesher stole $5,000 from Victim's bathroom floor; there was no mention that Chesher wrote the bad check Victim was complaining about at the prosecutor's office. No one at the prosecutor's office knew to whom Victim was referring when Victim stated that he was going to "kill him." In addition to these threats being vague, these statements were made well before the March 4 incident. Specifically, Victim's first threat was at least two months before Victim's death, and the second threat was made at least several days before the incident. We do not find this evidence to be legally relevant to support Chesher's trial defense that Victim was the initial aggressor and that Chesher acted in self-defense.

Even if we were to find that the trial court erred in excluding this evidence, which we do not, Chesher was not prejudiced as a result. As discussed, Victim's threats at the prosecutor's office were vague, remote in time, and not directed at Chesher. At trial, the jury heard evidence of direct threats by Victim made directly to Chesher mere days before the March 4 incident. Specifically, Victim's voice messages to Chesher were played for the jury. During Chesher's closing argument, he emphasized for the jury that Victim made threats against Chesher prior to the incident and that Victim "had threatened [Chesher's] family, even his children." Further, the jury heard evidence that Victim went to Chesher's house days before the incident seeking to get back the money Victim believed Chesher stole, and Victim was at Chesher's house roughly one hour before the

12

incident for the purpose of retrieving this money. As noted, the jury was instructed to consider any threats by Victim against Chesher when determining "whether [Chesher] reasonably believed that the use of physical force was necessary to defend himself from what he reasonably believed to be the use of or imminent use of unlawful force by [Victim]." We find there is no reasonable probability that the admission of Victim's random threats at the prosecutor's office would have had an effect on the outcome of the trial. Thus, the trial court did not abuse its discretion in sustaining the State's motion to quash the subpoenas of witnesses M.M., R.S., and R.B. *Cf. State v. Hartman*, 488 S.W.3d 53, 60 (Mo. banc 2016) (holding trial court abused its discretion and defendant was prejudiced because excluded testimony could have exonerated defendant of first-degree murder).

Point I denied.

**Admission of underlying facts from prior conviction**

In Chesher's second point on appeal, he asserts the trial court abused its discretion in admitting information about Chesher's prior conviction for domestic assault in the second degree because this evidence was more prejudicial than probative and was offered only to show Chesher's propensity to commit this type of offense. We find the trial court did not abuse its discretion in admitting this evidence.

Before trial, the State filed a "MOTION IN LIMINE TO ADMIT EVIDENCE OF DEFENDANT'S PRIOR CONVICTION,"[7] as evidence of Chesher's "identity or common

---

[7] While the State categorized its motion as a motion *in limine*, the motion sought to obtain a ruling to allow it to admit evidence rather than exclude evidence. *See Jefferson v. Lyon*

scheme or plan, and intent or absence of mistake or accident."  Chesher's prior conviction was for the felony of domestic assault in the second degree where Chesher "knowingly caused physical injury to [ex-girlfriend] by striking [her] in the face with a closed fist, and by means of a dangerous instrument by striking [her] with a motor vehicle . . . ."  The State argued this evidence was admissible to assist the jury as it provided the full context of Chesher's intent and that his actions on March 4, 2022, were of no mistake because Chesher kept "alluding to the idea that [the incident] was somehow a mistake or that he didn't have a choice in the matter."  The trial court sustained the State's request, noting that Chesher's, "prior bad act of using a motor vehicle to assault an individual who was attempting to leave the area after an altercation with [Chesher] is logically relevant because [Chesher] will call into question identity, intent, and whether he *meant* to hurt or kill the victim."  At the conclusion of the State's case in chief, the State offered into evidence a certified copy of the criminal information filed against him as well as his plea of guilty and sentence in regard to Chesher's prior conviction.  The certified copies of these documents were admitted over Chesher's objection.  The only factual details regarding the nature of the prior offense were those contained in the charging document that was filed against him in that matter.

Chesher asserts his prior conviction was improper propensity evidence, and it could not be admitted to show Chesher's motive, intent, and/or absence of mistake or

---

*Sheet Metal Works*, 376 S.W.3d 37, 41 (Mo. App. E.D. 2012) ("[A] motion in limine is used to exclude evidence in a jury trial which would be unfairly prejudicial or inflammatory.") (internal citation and quotation omitted).

accident for the underlying crime. Chesher fails to acknowledge the fact that evidence of his prior conviction was admissible and is in fact necessary for the State to prove the offense under Count III for unlawful possession of a firearm, as it was used to establish that Chesher was a convicted felon making it illegal for him to be in possession of a firearm. *See* Section 571.070; *State v. McKay*, 411 S.W.3d 295, 306 (Mo. App. E.D. 2013) ("[N]ot only did Appellant's prior felony conviction have a legitimate tendency to establish his guilt of the unlawful firearm possession charge, it was a required element."). Given that it was permissible for the State to introduce the prior conviction to support Count III, we find the trial court did not abuse its discretion.[8]

Point II denied.

---

[8] Any issues related to redaction of details from the prior conviction, the State's reference to the prior conviction during closing argument, and jury instruction number five informing the jury it could consider Chesher's prior conviction "on the issue of motive, intent, absent [sic] of mistake or accident, or presence of a common scheme or plan[,]" are not before us. As noted, Chesher's argument is that the trial court abused its discretion in admitting evidence of Chesher's prior conviction.

## Conclusion

We affirm the judgment of the trial court.

_____
Gary D. Witt, Judge

All concur